**UNITED STATES of America,**
**Appellee,**

**v.**

**Leonard W. WISNIEWSKI et al.,**
**Appellants.**

**No. 628, Docket 72–1671.**

United States Court of Appeals,
Second Circuit.

Argued March 1, 1973.

Decided April 3, 1973.

Warren A. Luedecker, Bridgeport, Conn., for appellants Wisniewski, Novak, Camillo, Jr., Benoit and DiFederico.

Raymond B. Rubens, Bridgeport, Conn. (Rubens & Saffo, Bridgeport, Conn., of counsel), for appellant Staires.

W. Paul Flynn, New Haven, Conn. (Kopkind, Flynn & Raccio, P.C., New Haven, Conn., of counsel), for appellant Cavallaro.

Lucy V. Katz, Attorney, Bridgeport, Conn. (Koskoff, Koskoff, Rutkin & Bieder, Theodore I. Koskoff, Bridgeport, Conn., of counsel), for appellant Pulver.

Barry J. Cutler, Asst. U. S. Atty. (Stewart H. Jones, U. S. Atty., D.

Conn., New Haven, Conn., of counsel), for appellee.

Before KAUFMAN and MANSFIELD, Circuit Judges, and BRYAN, District Judge.*

MANSFIELD, Circuit Judge:

In this prosecution for the knowing receipt and concealment of stolen motor vehicles in violation of 18 U.S.C. §§ 2313 and 2,[1] eight co-defendants appeal from a judgment of conviction entered May 23, 1972, in the United States District Court for the District of Connecticut following jury verdicts of guilty in a trial before Judge Thomas F. Croake of the Southern District of New York, sitting by designation. Appellants Leonard Wisniewski, Robert Staires, Jeffrey Pulver, Salvatoro Cavallaro and Ernest Novak, were named in three counts of the indictment: the first for the receipt and concealment of a stolen 1971 red Ford station wagon; the second for the receipt and concealment of a stolen 1969 gold Pontiac; and the third for the receipt and concealment of a stolen 1968 blue Cadillac. Appellants Dennis Di-Federico and David Benoit were named in the first two counts and defendant Joseph Camillo, Jr. was named in the first and third counts.[2]

On appeal all defendants raise the impropriety of admitting certain testimony at trial allegedly stemming from an unlawful arrest. Some also claim that the evidence was insufficient as to them, that the trial judge committed reversible error in his charge and that they were denied effective assistance of counsel for the reason that all defendants were represented by the same trial counsel. As we find these assertions to be without merit, we affirm the convictions.

On December 13, 1971, a team of FBI agents commenced surveillance of Leonard's House of Buys and of the Milford Salvage Company, enterprises located on adjacent properties in Milford, Connecticut, and owned by the defendant Leonard Wisniewski. The bulk of the government's case was based on the testimony of the FBI agents and photographs taken by them in the course of their surveillance. The agents observed stolen cars being delivered to these premises, which resembled a combination used car lot and junk yard, and there dismantled with the apparent purpose of selling the resulting automobile parts.

In the late afternoon of December 15, 1971, a stolen 1971 red Ford station wagon with New York license plates, the subject of the first count, was driven up to Leonard's House of Buys. Following closely behind was a white 1965 Pontiac Bonneville, also with New York plates, which was to accompany each of the other stolen cars specified in the indictment. Agent Chastain testified that on December 15 he saw the defendants Benoit, Pulver, Novak and Wisniewski en-

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. 18 U.S.C. § 2313 provides:

   "Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to be stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

   18 U.S.C. § 2 provides:

   "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal.

   (b) Whoever wilfully causes an act to be done, which if directly performed by him or another, would be an offense against the United States is punishable as a principal."

2. The indictment contained six counts. None of the appellants was named in Counts 4–6, which involved the transportation of stolen vehicles in violation of 18 U.S.C. §§ 2312 and 2.

   A ninth co-defendant, Clifford Johnson, was tried with the eight appellants, but a judgment of acquittal was entered at the close of the evidence with the government's consent.

   A directed judgment of acquittal on Count 2 was entered as to defendant Cavallaro.

gaging in various activities apparently pertaining to the stolen car. Pulver was observed driving the stolen red station wagon from the House of Buys to the rear side of the Milford Salvage building, from which bright reflections then appeared, indicating that a blow torch was being used.

On the following day, December 16, 1971, defendants Cavallaro, Camillo, DiFederico, Benoit, Novak, Staires and Wisniewski were seen in the surveillance area. Agent Chastain "observe[d] the doors [of the stolen 1971 Ford] had been removed, the seats removed, the hood and fender removed from the car: in fact, it was still steaming or smoking from that area." Shortly thereafter other incriminating conduct was observed: Staires exited from the Milford Salvage building carrying "a car type radio"; Wisniewski, sometimes with Staires and Pulver by his side, was seen using hand motions apparently to direct his colleagues, including DiFederico and Novak, as to the disposition of car parts; Benoit was seen driving a yellow truck carrying the body of a red station wagon; parts of a car frame were observed in a green truck driven by defendant Camillo; another truck (with Staires in the rear) transported what appeared to be the nose of a red Ford to a nearby Ford dealer. Salvador Vargas, an insurance adjuster, testified that he had informed Wisniewski in early December, that he was in need of a nose of a 1971 Ford station wagon.

The drama continued on December 17, 1971. The government established that another car of recent vintage, a 1969 gold Pontiac, had been stolen on that date. Subsequently, on that day the stolen gold 1969 Pontiac, followed by the same white 1965 Pontiac that had accompanied the stolen 1971 Ford upon its arrival at the premises, was delivered to the surveillance area. Once again Wisniewski, Staires, Benoit, DiFederico, Novak and Pulver were seen on the prem-

ises. This stolen car, like its predecessor, was driven "through the parking lot in front of Leonard's House of Buys, down over the little incline, into the junk yard; drove it through the junk yard and turned to go through the gate. . . . The car (the gold Pontiac) then went behind the Milford Salvage building and out of my sight." Thus the second stolen car was secreted.

Finally we come to December 27, the day of the arrests, and the day of the receipt of the stolen blue 1969 Cadillac, the subject of the third count. The owner of the car testified that it had been stolen that day and that the trunk contained a yellow box filled with a half case of Cutty Sark scotch. With Wisniewski, Staires, Pulver and Camillo on the porch of the House of Buys, two automobiles with New York licenses, the stolen blue Cadillac and the familiar white Bonneville, were driven into the parking lot. The Cadillac was then driven "through the parking lot, down over the embankment, through the junk yard . . . and out of sight behind the Milford Salvage building." Shortly thereafter Staires was seen walking from the Salvage building to the "House of Buys" carrying a "yellow box with the Cutty Sark on it." After communicating with an FBI supervisor and with the local police, Agent Chastain, with the purpose of making an arrest, entered the Salvage building where he saw Novak, Camillo and Cavallaro next to the stolen 1969 Cadillac, already partially dismantled, at which time they were arrested. Arrests of the other defendants followed.

Thus the two-week surveillance uncovered evidence (including the receipt and disposition of three stolen late model cars) which, when viewed most favorably to the government, established that the defendants were acting in criminal concert to carry out a highly organized scheme to receive, conceal and dismantle stolen cars. The jury found all defend-

ants guilty of the counts submitted for verdict.[3]

All defendants assert that the trial judge erred in admitting into evidence that portion of Agent Chastain's testimony which referred to his observations and certain photographs taken at the time of making the arrest on December 27, 1971. It is contended that no probable cause existed for the entry and arrest, that in any event an arrest warrant should have been obtained, and that since the arrests were therefore unlawful any resulting evidence was tainted and should have been suppressed.

"The lawfulness of the arrest without warrant . . . must be based upon probable cause, which exists where the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense . . . is being committed." Ker v. California, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963) (citations omitted). "Agents of the FBI have statutory authority to make felony arrests without a warrant for offenses 'committed in their presence,' or where they have 'reasonable grounds to believe that the person to be arrested has committed or is committing' felony, 18 U.S.C. § 3052.[4] The 'reasonable grounds' requirement of the statute is equivalent to the Fourth Amendment's requirement that arrests may be made only upon 'probable cause'. What constitutes 'reasonableness' or 'probable cause' must depend upon the specific facts of each case. . . . " United States v. Elgisser, 334 F.2d 103, 109 (2d Cir.), cert. denied, Gladstein v. United States, 379 U.S. 879, 85 S.Ct. 148, 13 L.Ed.2d 86 (1964) (citations omitted).[5] See United States v. Drummond, 354 F.2d 132, 153 (2d Cir. 1965), cert. denied, 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966); Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

■ Here it is clear that the arresting officials had ample probable cause to believe that the crime of receiving stolen automobiles was being committed. A late model stolen Cadillac, accompanied by the tell-tale white Bonneville, appeared on the premises and was prompt-

3. Judge Croake imposed prison sentences ranging from 6 to 30 months. Defendants Pulver and Novak, who were charged and convicted on all three counts, were each sentenced on Count 1 to a split sentence of six months, followed by a two-year probationary period. Sentence was suspended on Counts 2 and 3 and probation imposed concurrently with probation on Count 1. Defendants Camillo, Di-Federico, and Benoit each received the same sentence except that, since they had been charged and convicted on only two counts (DiFederico and Benoit on Counts 1 and 2, Camillo, Counts 1 and 3), their probation term was made concurrent with one count.

Defendant Staires, who was charged and convicted on all three counts, was sentenced to imprisonment for a term of one year and six months, followed by concurrent terms of one year of probation on each of the other counts.

Defendant Cavallaro, who was convicted on Counts 1 and 3 (he received a directed acquittal on Count 2, see note 2 supra), was sentenced to imprisonment for a period of two years and six months on Count 1, with a suspended sentence on Count 3.

Defendant Wisniewski was sentenced to concurrent terms of two years and six months on each count, to run consecutively to a prior five year sentence in another case which he was then serving. In addition, he was fined $15,000 ($5,000 on each count).

4. 18 U.S.C. § 3052 provides in pertinent part:

"[T]he Director, Associate Director . . . and agents of the Federal Bureau of Investigation of the Department of Justice may . . . make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States, if they have reasonable grounds to believe that the person arrested has committed or is committing such felony."

5. The arrests were a joint effort of the F.B.I. and the local police who were acting pursuant to Connecticut General Statute § 6–49.

ly secreted behind the Salvage building. Present were the same persons who had played varying parts in the earlier receipt and concealment of two other stolen cars. Moreover, the agents knew that less than two weeks earlier the stolen red Ford had promptly been dismembered upon delivery. They feared—with justification as it turned out—that the Cadillac was destined for a similar fate. Under the circumstances the arresting officers were amply justified in taking prompt action. Cf. United States v. Coplon, 185 F.2d 629, 635 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952). Furthermore the government offered at trial to prove that the agents, before closing in to make the arrests, had been informed that the Cadillac had in fact been stolen.

■ The contention that the court was foreclosed from considering the government's offer of proof as to the agents' being informed regarding the theft of the Cadillac is meritless. Despite ample notice of the government's intended proof, the motion was, with Judge Croake's permission, made during trial. No abuse of discretion is shown on his part in denying the motion. See United States v. Romero, 249 F.2d 371, 374 (2d Cir. 1957); United States v. DiDonato, 301 F.2d 383, 384 (2d Cir.), cert. denied, 370 U.S. 917, 82 S.Ct. 1557, 8 L.Ed.2d 497 (1962); United States v. Watts, 319 F.2d 659, 660 (2d Cir. 1963); United States v. Roth, 430 F.2d 1137, 1139 (2d Cir. 1970). Cf. F.R.Cr.P. Rule 41(e).

Appellants Staires, Cavallaro and Pulver contend that the evidence did not establish knowledge on their part that the cars were stolen or that they actually participated in the offenses, elements necessary to convict them either as principals or as aiders and abettors. See 18 U.S.C. §§ 2313 and 2. We find these contentions without merit.

■ While mere coincidental presence at the scene of a crime is insufficient to establish participation, see United States v. Vilhotti, 452 F.2d 1186, 1188 (2d Cir. 1971), cert. denied, 406 U.S. 947, 92 S. Ct. 2051, 32 L.Ed.2d 335 (1972); United States v. Kearse, 444 F.2d 62, 63–64 (2d Cir. 1971), "evidence of an act of relatively slight moment may warrant a jury finding participation in a crime . . . [and] that participation may be proved by circumstantial evidence. . . . " United States v. Garguilo, 310 F.2d 249, 253 (2d Cir. 1962). In addition "[t]he trier is entitled, in fact bound to consider the evidence as a whole, and, in law as in life, the effect of this generally is much greater than the sum of the parts." United States v. Bottone, 365 F.2d 389, 392 (2d Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966) (where the aggregate circumstances were deemed sufficient to prove knowledge). Moreover, "[e]ach of the three episodes gained color from each of the others." United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962).

■ Applying the foregoing principles here, the evidence was more than ample to support the conclusion that Staires, Cavallaro and Pulver were each active participants in the scheme to conceal and dismantle late model stolen automobiles. Staires was observed in the salvage area when all three of the stolen cars were secreted there. He was seen talking to Pulver on the evening of December 15 after Pulver had driven the red Ford behind the Salvage building. On December 16 he was seen carrying a "car-type radio" and was in the rear of the truck which contained the dismantled red Ford "nose." The jury was entitled to infer that the radio and "nose" came from the just-dismantled stolen Ford station wagon. On December 17 Staires, with Pulver, "drove through the lot in the manner that a gold Pontiac had gone, through the gate and behind the Salvage building." On December 27 Staires was observed carrying a yellow "Cutty Sark" box matching the description of the box that, according to the testimony of the owner of the stolen Cadillac, had been in

the trunk of his car at the time when it was stolen.

Cavallaro was observed next to the partially dismantled stolen Cadillac at the moment of the arrests on December 27. In addition, on December 16, he was observed walking back and forth from the House of Buys to the Salvage building during the period when the dismantled red Ford was still lodged on the premises.

As to Pulver, he was observed on the premises on all of the pertinent dates, December 15, 16, 17 and 27. He was there with Wisniewski when both the Ford and the Cadillac were received. At the close of business on December 15 he walked out of the House of Buys with Wisniewski, Novak and Benoit and after talking with Wisniewski he drove the stolen Ford through a tortuous route to a spot near a set of junk cars, returning to the House of Buys. Then at 6:11 P. M., when it was dark, he exited the House of Buys, entered the Ford and drove it through the junk yard into the back of the Salvage area where it was parked out of sight. At that time there were "reflections" from the back of the Salvage building from which the jury might infer that a torch was being used. On December 16, after the Ford had been cut up, he was seen with Wisniewski and Staires as Wisniewski was directing operations in the yard. On Decem-

ber 17 he and Staires were seen driving to the rear of the Salvage building shortly after the gold Pontiac had been secreted there and on December 27 Pulver was seen with Wisniewski, Staires and Camillo as the stolen Cadillac was delivered to the premises.

From all of the foregoing, the jury could infer beyond a reasonable doubt that these three defendants (Staires, Cavallaro and Pulver) were guilty as charged.

■ Likewise without merit is the assertion by Staires, Pulver and Cavallaro that Judge Croake's charge on "aiding and abetting" did not adequately instruct the jury as to the necessity for proving actual participation on their part, see United States v. Peoni, 100 F. 2d 401, 402 (2d Cir.1938); Nye & Nissen v. United States, 336 U.S. 613, 618–619, 69 S.Ct. 766, 93 L.Ed. 919 (1949). After instructing that for aiding and abetting "the guilt of a particular accused may be established without proof that he personally did every act constituting the offense charged," and quoting from the text of 18 U.S.C. §§ 2(a) and (b), Judge Croake continued: "Every person who thus *wilfully participates* in the commission of a crime may be found guilty of the offense" (emphasis added).[6] Thereupon he emphasized the need for knowledge and intent. However in view of his earlier reference to

---

6. The relevant portion of the charge relating to "aiding and abetting" provided:

"In a case where two or more persons are charged with the commission of a crime, the guilt of a particular accused may be established without proof that he personally did every act constituting the offense charged.

"Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"Whoever wilfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

"Every person who thus wilfully participates in the commission of a crime may be found guilty of the offense.

"Obviously one cannot aid and abet in commission of a crime unless there is another who has committed the offense. One is guilty as an aider and abettor when he consciously shares in any criminal intent. One need not agree to or even know all details, minor or otherwise of a criminal transaction in order to aid and abet commission thereof. However, one must have knowledge. One must have knowledge of the essential elements of the offense, that is, that the vehicle named in a particular count of the indictment was stolen, and know that it was wilfully transported by a defendant or defendants from one state to another."

the necessity for proving willful participation, the emphasis on knowledge and intent was not error, especially since it was given in response to a specific request of defense counsel, whose defense strategy was based principally upon his contention that the government had failed to prove guilty knowledge.

■ A more serious issue is the contention of Staires, Cavallaro and Pulver that they were denied their Sixth Amendment right to effective assistance of counsel because their trial counsel, Warren Luedecker, represented all defendants below. From this common representation they argue that his ability to devote his full and undivided professional skill to the defense of each of them was hampered because of possible conflicting interests of his clients. The gravamen of the argument is that Luedecker had represented Wisniewski in the past and that while all of the defendants had retained Luedecker, the entire fee had been paid by Wisniewski; Luedecker would not, therefore, develop evidence disassociating the other defendants from Wisniewski. The result, it is asserted, was that at trial a defense was selected in which appellants were required to close ranks and present a united front, contending that they had been running a large legitimate junk yard and were the unwitting victims of two men who dealt in stolen cars.

■ "The rule in this circuit is that some specific instance of prejudice, some real conflict of interest, resulting from a joint representation must be shown to exist before it can be said that an appellant has been denied the effective assistance of counsel." United States v. Lovano, 420 F.2d 769, 773 (2d Cir.), cert. denied, 397 U.S. 1071, 90 S.Ct. 1515, 25 L.Ed.2d 694 (1970). See also Morgan v. United States, 396 F.2d 110, 114 (2d Cir.1968). Since neither Staires nor Cavallaro points to facts indicating that they suffered any prejudice, their claim can be rejected without further discussion.

Pulver contends on appeal that Luedecker failed adequately to bring out the weakness of the government's case against him and to develop an individual defense that might have exonerated him individually. He asserts that since he had no prior record, he should have been called to testify in his own defense that he was present on the premises merely looking for used car parts, that he never was employed or had any business connections with Wisniewski other than as a customer, that he drove the red Ford merely as a favor to Wisniewski and that he had no knowledge of any illegal activity. In addition, Pulver contends that the proceedings below did not adequately screen potential conflicts and that Pulver was not adequately apprised of the dangers of a possible conflict.

We are not here dealing with negligence on the part of the trial judge or defense counsel in failing to inquire into the possibility of a conflict of interest. On the contrary, from the very outset both the court and the government evidenced a keen sensitivity to the subject and repeatedly sought to ferret out from the defendants and their retained common counsel whether there were facts or separate defenses indicating the necessity for separate representation. On December 27, 1971, at a preliminary hearing, Magistrate Latimer drew the attention of the defendants to the question of whether there was a conflict of interest that might render separate representation necessary. In response all defendants indicated satisfaction with Mr. Luedecker's joint representation of them. On February 24, 1972, Luedecker appeared on behalf of the defendants to enter pleas of not guilty. At the government's suggestion, Judge Newman expressed concern about a conflict, leaving to defense counsel, at least initially, the burden "to satisfy himself and his clients that, in undertaking to represent all nine defendants, no question of in-

consistent defenses or any other related matter comes up." Luedecker replied that he had advised the defendants of the problem stating "I envision no conflict. And in good conscience, if there is a conflict I will so advise the accused. . . ." Luedecker later added that "I have nine accused. I have to evaluate each case independently of the other."[7]

On April 3, 1972, Judge Timbers, before whom the case was originally scheduled to be tried, inquired on his own initiative about any possible conflict of interest.[8] Luedecker informed the court in the defendants' presence that on several occasions he had informed the defendants of a possible conflict of interest and that they had a right to counsel

7.  "Mr. Luedecker: Of course, your Honor.

"If I may, just for the record, your Honor: When the nine accused were arrested, I undertook to have all the accused bonded out or on their own recognizance. And at that time, unequivocally I told all the defendants that I would represent them at this stage of the proceeding, but I did not envision any conflict, and that I would continue to represent them; if a conflict developed at a later date, of course I would have to ask other accused to seek other counsel.

"We had a preliminary hearing before Magistrate Latimer. And Magistrate Latimer raised the same issue; again asked me whether or not there was any conflict. I told him that at that stage of the proceeding I saw none.

"He advised all the accused in the matter, of a possible conflict or whether or not there was any conflict; and I think that all the accused at that time indicated that they saw no conflict, that they wanted me to represent them, and that I would represent them; if a conflict developed at a later date, then of course I would have to advise them to seek other counsel.

"As I stand here at this very moment, I envision no conflict. And in good conscience, if there is a conflict I will so advise the accused, and I may have to get out of numerous cases or some of the cases, and those accused would have to seek other counsel."

8.  "The Court: . . .

"The one remaining matter that I wish to take up—and this is in the same case, United States against Wisniewski and others—again is a matter that I have raised of my own initiative, even though I understand it is a matter that has been inquired into by Judge Newman on January 24 of this year, and prior thereto by United States Magistrate Latimer. And it is simply this: In view of the fact that—I believe it is nine named defendants are represented by one lawyer, Mr. Luedecker, I simply inquired, being new to the case, whether

there was any question of a possible conflict of interest arising from the fact that more than one defendant is represented by the same lawyer.

"And I have been informed that there is believed to be no basis for a conflict; and on the contrary, I am informed that both Mr. Luedecker and his clients are satisfied that he *should* represent them, that they want him to represent them, that they do not want other counsel either by their own selection or by court appointment to represent them; and therefore the case should go foward that way.

"And I might say that, if that is the fact, that is entirely acceptable to me.

"But out of an excess of caution, and in order to save time in connection with the actual trial of the case that will begin two weeks from today before Judge Croake, I of my own initiative do wish to raise this question in the presence of—I think all nine defendants are here seated in the front row, immediately behind their lawyer, Mr. Luedecker.

"And I will suggest this procedure: I am simply going to ask Mr. Luedecker, who is the attorney of record for each of the defendants in this case, to state here in open court on the record, in the presence of the nine defendants, the facts as he understands them.

"I will ask each of the nine gentlemen in the front row to listen carefully to what Mr. Luedecker says; because, when Mr. Luedecker finishes, I am going to ask each of you individually to stand up and, in effect, say whether you agree with Mr. Luedecker or not.

"The purpose of this is not just a mechanical thing. It is an honest, genuine effort on the part of the Court to ascertain at this stage of the proceeding whether each defendant, knowing that he is being represented by the same lawyer who represents his eight co-defendants, is willing to have it that way and expresses that—whether he expresses that willingness, knowing that he has the right, if he wishes to insist upon having separate counsel retained by him or court-appointed by the Court to represent him."

of their choosing, whether privately retained or court appointed.[9] Judge Timbers then individually asked the defendants whether they understood what Luedecker had said and whether they still wanted him as their attorney. Each defendant individually answered in the affirmative.[10]

9. "Mr. Luedecker: If your Honor please, I would like the record to reflect that I have represented these nine accused, the nine named accused in the indictment, since on or about January 3 of 1972.

"At that time, when I first undertook to represent the defendants, I advised them at that time as to what they could or couldn't do. I asked them whether or not they wanted me to represent them.

"And at that time, all unequivocally said that they wanted me to represent them in this matter.

"I advised them specifically at that time that, representing multiple defendants, there was possibly a conflict of interest; I did not envision a conflict of interest at that time; and since there was no conflict, I did appear on behalf of the accused.

"We subsequently, shortly thereafter, had a hearing before Magistrate Latimer. And at that time I think there were only seven of the nine accused, at that time. But it is my recollection at that time that Judge Latimer again asked whether or not there was a conflict of interest or whether or not there was a possible conflict of interest.

"And in the presence of all the then accused, I told him I did not envision a conflict; if, however, conflict did arise at a later date, I would bring it to the attention of the Court, to the attention of the defendants, and perhaps some of the accused or all of the accused would have to seek other counsel.

"The defendants were put to plea on or about January 24, 1972 before Judge Newman in New Haven. And at that time all the accused were present.

"Judge Newman, or Mr. Byelas on behalf of the Government, again raised the question of a possible conflict of interest.

"I expressed myself on the record at that time, that I had reviewed the matter with the accused, that I did not envision a conflict, and that, if a conflict did arise on a later date, I would proceed accordingly.

"I also told the accused at that time that they had a right to counsel of their own choice, and that counsel of their own choice could either be other private counsel or court-appointed counsel, in the event that they qualified for court-appointed counsel.

"Subsequent to appearing in New Haven, I conferred with the accused on other occasions. I have made it clear, on the subsequent occasions, they have at all times a right to counsel of their own choice.

"I met with all the accused except Mr. Wisniewski last Friday. I again spent hours with the accused. And, among other things, at that time I again told them among other rights they had a right to counsel of their own choosing, whether it be private or court-appointed; if, however, they elected to proceed with me, I would be pleased to proceed on their behalf.

"I talked to the accused again this morning, except as to the accused Mr. Wisniewski, and they again expressed— withdrawn. They again indicated they understood they had a right to private or public counsel of their own choice, but they elected to proceed, my representing all the accused in this case."

10. "The Court. Perhaps you can just step forward.

"And I will ask each of the other defendants please to listen, because it will save a little time if I simply ask hereafter if you have heard the question put to Mr. Wisniewski, and what is your answer.

"My question is as simple as possible, Mr. Wisniewski: First, have you fully heard and understood what your lawyer, Mr. Luedecker, has just said to the Court?

"Defendant Wisniewski: Yes, I did, sir.

"The Court: And on the basis of Mr. Luedecker's statement to the Court, are you willing to have this case proceed, with Mr. Luedecker representing your eight co-defendants as well as yourself?

"Defendant Wisniewski: That I am, sir.

\*     \*     \*     \*     \*

"The Court: Mr. Pulver, is your full name Jeffrey L. Pulver?

"Defendant Pulver: Yes, your Honor.

"The Court: Have you heard and fully understood what your lawyer, Mr. Luedecker, has just stated here in open court on the record with respect to the matter of his representing you and the other eight co-defendants?

"Defendant Pulver: Yes, your Honor.

Had there not been such repeated searching inquiries by the court into the question of potential conflict of interest, followed by statements both by the defendants' counsel and by the defendants themselves that no such conflict existed, we might, in view of the defendant Pulver's post-trial contentions, have remanded the case for a hearing on the issue, as was done in Morgan v. United States, 396 F.2d 110, 114 (2d Cir.1968), where no such earlier inquiry had been made by the court. But the very fact of such repeated inquiries militates against such a course. Pulver was no moron. He had attended college for two years and had served in the Army. Both the existence and the significance of any possible conflict of interest between himself and the other defendants, had one existed, should have been apparent to him, especially after his attention was repeatedly drawn to the possibility of conflict.

From the outset each defendant was virtually forced to consider whether he might have a position sufficiently different from that of the others to enable him to contend and prove that, regardless what the others might have known, he was unaware that the three cars had been stolen. Any such uniqueness in one defendant's position would undoubtedly have been exploited to the hilt. But if the position of each on the key question of guilty knowledge was substantially the same as that of the others, as apparently was the case, each might stand a better chance of acquittal by joining in one monolithic claim of ignorance than by riding off in different directions.

■ In the face of repeated judicial inquiries into the subject of any possible conflict of interest, we cannot assume that the defendants' legal counsel, a reputable lawyer experienced in the trial of criminal cases, falsely advised the court that no conflict of interest existed. Nor can we assume that he would have sacrificed one of the defendant's chances of acquittal to those of another. In stating that he was required "to evaluate each case independently of the other," he recognized the necessity of weighing carefully, among other things, the advisability of having one or more of the defendants present affirmative evidence of his lack of guilty knowledge. In resolving that issue he could not, consistently with his duties as a member of the court, consciously permit his client to commit perjury. Furthermore he could not overlook the fact that presentation of such proof might be fraught with serious risks, including the danger that the defendant, if he took the stand, might be confronted with incriminatory evidence of his own knowing involvement. Thus, although Pulver might have taken the stand and denied guilty knowledge, he might also have faced a blistering cross-examination.

■ When a trial culminates in a verdict of guilty the temptation is great for a defendant, armed with hindsight, to claim that his lawyer's strategy in not permitting him to run the cross-examination gauntlet was motivated by a conflict of interest. We do not say that such belated assertions are to be ignored. Each case must, of course, be viewed on its own facts. However, in the absence of objective evidence of corroboratory circumstances, such post-trial claims must be viewed with some suspicion, especially when there has not been submitted a supporting affidavit of the attorney in accordance with the practice recommended in cases where clients belatedly raise a claim of ineffective assistance of counsel. Cf. United States v. Welton, 439 F.2d 824, 826 (2d Cir.), cert. denied, 404 U.S. 859, 92 S.Ct. 157, 30 L. Ed.2d 102 (1971); Korenfeld v. United States, 451 F.2d 770, 775 (2d Cir.1971),

"The Court: On the basis of Mr. Luedecker's statement to the Court, are you willing that the case should proceed to trial with Mr. Luedecker representing your eight co-defendants as well as yourself?

"Defendant Pulver: Yes, your Honor."

cert. denied, 406 U.S. 975, 92 S.Ct. 2425, 32 L.Ed.2d 675 (1972).

■ To permit a *post hoc* judicial inquiry into earlier privileged attorney-client communications whenever a defendant seeks to set aside his conviction on grounds of conflict of interest on the part of his lawyer would be virtually to outlaw joint representation, since the temptation to attack his counsel's unsuccessful strategy would be too great for the disappointed client to resist, particularly when he stood to lose nothing by launching the attack. Such a *per se* rule conflicts with our statement in United States v. Armone, 363 F.2d 385, 406 (2d Cir.), cert. denied Viscardi v. United States, 385 U.S. 957, 87 S.Ct. 391, 17 L. Ed.2d 303,(1966), that the trial court's "inquiry of counsel as to possible conflict of interests in this case sufficed to protect any rights Viscardi (the appellant) may have had in the matter. The court must be allowed to accept an attorney's representations in matters of this kind, at least absent unusual circumstances." Absent objective proof we cannot assume that a lawyer representing more than one client would act in violation of the Code of Professional Responsibility, much less ignore the opportunity to introduce proof which might acquit one defendant but not the other. Indeed in Morgan v. United States, *supra*, relied upon by Pulver and Staires, we recognized (396 F.2d at p. 114) that "the trial judge should not be precluded from permitting [a] defendant to be represented by counsel for a co-defendant if counsel, with the consent of both defendants, agrees to do so and if the judge, after careful inquiry, is satisfied that no prejudice will result. Obviously, the trial judge, who is in a position to talk to the parties and to make such inquiry, both public and private, as may be necessary, should be given as free a hand as possible to deal with such situations." We remanded for a hearing in that case because it was "unclear from the record why the court appointed Stein's attorney to represent Morgan" and it appeared that the court may have been under an erroneous impression as to counsel's prior representation of both defendants, no inquiry as to a possible conflict apparently having been made. No such uncertainty exists here, where thorough and repeated inquiries were made and the absence of conflict was assured.

■ ■ In rejecting appellants' conflict of interest claim, we, of course, do not disparage the importance of a defendant's right to be represented by counsel possessing zealous and undivided regard for his client's interests. See, e. g., Glasser v. United States, 315 U.S. 60, 67–76, 62 S.Ct. 457, 86 L.Ed. 680 (1942). However, "defendants who retain counsel also have a right of constitutional dimension to representation by counsel of their own choice. . . ." United States v. Sheiner, 410 F.2d 337, 342 (2d Cir.1969).

Finding all of appellants' contentions to be without merit, we affirm.