UNITED STATES of America, Plaintiff,

v.

James MARTORANO, Defendant.

Crim. No. 75–436–C.

United States District Court,
D. Massachusetts.

Sept. 20, 1978.

Martin D. Boudreau, Sp. Atty., U. S. Dept. of Justice, Boston, Mass., for plaintiff.

Richard J. Vita, Boston, Mass., for defendant.

## OPINION

CAFFREY, Chief Judge.

Petitioner James Martorano has moved for a new trial pursuant to Fed.R.Crim.P. 33, claiming that he was denied effective assistance of counsel in violation of the Sixth Amendment. Martorano is currently incarcerated after his conviction on each count of a four count indictment. Counts one and two charged him with conspiring to make and with making an extortionate extension of credit (loansharking) in violation of 18 U.S.C.A. § 892(a). Count three charged conspiracy to use extortionate means to collect an extension of credit in violation of § 894(a). Count four charged one particular act of using extortionate means to collect an extension of credit. The Court of Appeals affirmed petitioner's conviction, 557 F.2d 1 (1st Cir. 1977), and denied a petition for rehearing, 561 F.2d 406 (1977). The Supreme Court denied *certiorari*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978).

A threshold question to be resolved is whether or not alleged ineffective assistance of counsel constitutes "newly discovered evidence" for purposes of Rule 33 of the

Federal Rules of Criminal Procedure pursuant to which rule Martorano has brought the instant proceeding. The Court of Appeals for the District of Columbia has allowed a defendant to proceed on a Rule 33 motion based on ineffective assistance of counsel on the theory that such ineffective assistance constituted newly discovered evidence for purposes of the rule. *United States v. Thompson*, 154 U.S.App.D.C. 347, 475 F.2d 931 (1973); *United States v. Smallwood*, 473 F.2d 98 (1972). That position has been squarely rejected by the Court of Appeals for the Seventh Circuit in *United States v. Ellison*, 557 F.2d 128 (7th Cir.), cert. denied, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977). The Court of Appeals for the Tenth Circuit in *United States v. Allen*, 554 F.2d 398, 404–405 (10th Cir. 1976), cert. denied, 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977), took a position which seems to agree with the Seventh Circuit. The Court of Appeals for this Circuit, because of the peculiar facts involved in the case before it, found it unnecessary to take a position on this point in *United States v. McCambridge*, 551 F.2d 865 (1977). If this issue be an open question in this Circuit, as it appears to be, the Court is of the opinion that the weight of authority supports a ruling that the issue of ineffective assistance of counsel is not "newly discovered evidence" for purposes of Rule 33, and I so rule.

■ In view of the fact that the above issue was not raised by counsel for the government and in view of the further fact that there has been a full evidentiary hearing supplemented by briefing by the parties, judicial economy dictates that rather than dismiss this matter this Court should treat it as if defendant had captioned his pleading as a petition under 28 U.S.C.A. § 2255, which the Court of Appeals in *United States v. Ellison, supra* at 134, took pains to point out is a permissible way for a defendant to raise the issue of inadequate representation. Accordingly, the remainder of this Opinion will proceed to a consideration of the merits of Martorano's claim as if he had filed a petition under 28 U.S.C.A. § 2255.

■ The essence of Martorano's bid for a new trial is an allegation that his Sixth Amendment rights were violated because Attorneys Joseph S. Oteri and Martin G. Weinberg, members of the same law firm, jointly represented Martorano and a co-defendant, Brian Halloran. Oteri and Weinberg were retained, not appointed, counsel, but that fact has no bearing on the claims raised here. *Foster v. United States*, 469 F.2d 1, 4 n.2 (1st Cir. 1972). The United States argues in response that Martorano exercised a knowing waiver of his right to separate counsel and, more importantly, that no prejudice resulted to him as a result of the joint representation.

A one-day evidentiary hearing of this matter was held, during which various witnesses, including the petitioner, Attorneys Oteri and Weinberg, and several F.B.I. agents, testified. On the basis of that hearing, and my review of the trial record, I find and rule as follows:

Martorano contacted Oteri to represent him prior to his indictment. Because Oteri was out of town at the time of Martorano's arraignment, September 26, 1975, before a Magistrate of this Court, another attorney, with no affiliation to the Oteri/Weinberg firm, represented him. Oteri's appearance was filed four days later. At Halloran's arraignment September 29, 1975, he was represented by Weinberg. No record of either Martorano's or Halloran's arraignment exists, but all parties concede that at the time of Halloran's arraignment, the Magistrate questioned him about possible conflict of interest in joint representation. The Magistrate also requested that counsel inform each defendant of his right to separate counsel and of the necessity of filing with the Court letters of waiver if either defendant wished to relinquish that right.

Consequently, Weinberg met with Martorano in his office on October 1, 1975. At that meeting, the following letter was hand-delivered to the petitioner by Weinberg.

Dear Jim:

Pursuant to general instructions issued by the Magistrate Willie Davis on September 29, 1975, I advise you as follows pursuant to the rules articulated by the United States Court of Appeals for the First Circuit in a case styled *United States v. Foster*, 369 F.2d 1. As you know, I represent both yourself and Brian Halloran in the above-captioned matter. The *Foster* case held that there were dangers to criminal defendants like yourselves inherent in any joint representation. The Court asked me to advise you of the risks involved in joint representation so that you would be aware of these risks and, would if you wished, retain separate counsel.

I enclose for consideration the following letter which I have authored on your behalf which, if it conforms to your desires, may be signed by you and forwarded back to me for the purposes of sending to the Court to satisfy its burden under the *Foster* case of ascertaining whether or not you are conscious and aware of the fact that you may retain separate counsel and may be prejudiced by joint representation.

Sincerely,
Joseph S. Oteri

As the clear language of the letter demonstrates, Martorano's counsel intended that it satisfy the Court's requirement that petitioner be advised of the risks of joint representation. In addition to receiving that letter from Oteri, during his meeting with Weinberg, Martorano himself signed the following letter, which was filed with this Court October 3, 1975, well before the trial:

Dear Magistrate Davis:

Pursuant to your instructions of September 29, 1975, I state to you that I am aware of the dangers which exist to criminal defendants and which are inherent in joint representation. I have discussed these risks with my attorney, Joseph S. Oteri, and I understand that I may retain separate counsel or if I qualify as an indigent I may have such counsel appointed for me by the Court. I am mindful of the risks and dangers of joint representation and I desire for Mr. Oteri to continue to represent me despite these risks and despite my knowledge that his office also represents a co-defendant in the above-captioned matter.

Sincerely,
James Martorano

Martorano now complains that this letter of waiver to the Court was not knowingly executed. The basis of his claim is his assertion that the letter was drafted by Weinberg and that he never read it prior to affixing his signature. He further alleges that neither Oteri nor Weinberg informed him of any specific conflict of interest possible in joint representation. He also complains that the Court never conducted an inquiry on the record as to whether he understood the potential conflict of joint representation.

In determining whether Martorano's waiver was knowingly executed, I recognize at the outset that the Supreme Court has unequivocally stated that joint representation is not *per se* violative of the Sixth Amendment. *E. g., Halloway v. Arkansas*, 435 U.S. 475 at 482, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). I note also that only recently the Court of Appeals for this Circuit has reiterated that a defendant may waive his right to separate counsel. *United States v. Waldman and Dick*, 579 F.2d 649, 652 (1978). On the other hand, I do not minimize the importance of a defendant's right to be represented by counsel possessing zealous and undivided regard for his interests. See, *e. g., Glasser v. United States*, 315 U.S. 60, 67–76, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

In assessing Martorano's letter of waiver, I note its absolutely clear, unambiguous and straightforward language. While Martorano has testified that he signed the letter without reading it, I find that testimony preposterous. The petitioner is a college graduate with the obvious ability to understand the meaning and impact of both Oteri's letter to him and his own letter to the Court. He is also a sophisticated businessman, and as such, I find he would not and

did not sign such a letter without reading it, particularly since not only has it not been suggested that he lacked the time to read it, but Weinberg specifically testified that he left Martorano sitting along with the letter in the law firm's law library for a period of between five to ten minutes while he (Weinberg) took a telephone call from another client. While Oteri and Weinberg testified that they failed to inform petitioner of any specific potential dangers of joint representation, I find that testimony less than credible, in light of the Oteri letter to Martorano.[1] That letter reveals in the first place that the Court had instructed counsel to inform Martorano of the possible dangers of joint representation, and, secondly, that the firm utilized that form of written communication to meet the Court's request.

On the basis of the letters on file, I rule that Martorano executed a knowing waiver of his right to separate counsel. However, because petitioner himself was not separately questioned by the Court as to his awareness of the risks of joint representation, a technical violation occurred of the duty of inquiry established in *United States v. Foster*, 469 F.2d 1 (1st Cir. 1972). Consequently, it is necessary to consider whether any prejudice resulted to petitioner from joint representation, bearing in mind that the burden rests on the Government to disprove prejudice. *United States v. Donahue*, 560 F.2d 1039, 1044 (1st Cir. 1977). Martorano contends that he was prejudiced by three strategies employed at trial: (1) the decision to have him take the stand; (2) the failure of his co-defendant Halloran to take the stand; and (3) the failure of defense counsel to call as a witness Louis ("Bugsy") Pallotta, brother of Peter Pallota, the chief prosecution witness.

In regard to his own testimony, Martorano argues that he was prejudiced because prior to trial he did not expect to testify due to his concern about his prior criminal record being used for impeachment. That argument fails completely, however, because review of the trial record reveals that Martorano's previous criminal record had been brought to the attention of the jury before Martorano ever took the witness stand. The chief government witness, Peter Pallotta, had already testified as to Martorano's convictions to show his state of mind and the basis of his fear of Martorano and his expectation that Martorano would use extortionate means to collect the loan that Pallotta owed Martorano. Oteri testified that once the prior criminal record was before the jury, then the appropriate theory of defense became for Martorano to testify to explain away his prior convictions. In Oteri's words, Martorano

> is a very bright man and he made a very, very intelligent observation about the pros and cons of this thing and he was concerned about that. My feeling was it was in evidence and the jury had heard it and if it was uncontroverted, the jury would believe he had been convicted of those two crimes and by taking the stand, one of the benefits that accrued to us, I felt, we could get him to explain the background of those crimes and it worked very well. He did get to explain it.

While an affidavit Martorano submitted with the motion for new trial quotes Weinberg as saying to him: "The only way we can pull this out of the fire, Jim, is for you to testify, and rebut testimony about Brian's reputation, and Brian will have to testify, too," on the basis of the record before me, I specifically disbelieve Martorano's allegations in that affidavit particularly because when Martorano did take the witness stand in the trial he was not asked a single question about Halloran's reputation and no attempt was made to use Martorano to rebut anything about Halloran's reputation, which, in fact, had not been the subject of any testimony. Instead, Martorano's testimony consisted of a concentrated attempt by him to explain away the evidence then

---

1. I am also mindful that the ABA *Code of Professional Responsibility* EC 5–16, states in pertinent part: [B]efore a lawyer may represent multiple clients, he should explain fully to each client the clear implications of the common representation. . . ." See also DR 5–105(C).

before the jury which strongly tended to incriminate Martorano. Specifically, as Oteri noted in his testimony, the Court had admitted certain tape recordings implicating Martorano. Oteri stated that: "the tapes had to be explained away for Jimmy to have any chance to be acquitted . . I didn't think he could be acquitted without taking the stand after that happened." Oteri further commented that he thought Martorano "would be an exceptionally good witness. He is bright. He is attractive . . . and I really felt, and feel to this day, that it was the right thing to do and he was a great witness." Both attorneys Oteri and Weinberg testified that on their understanding of the law they erroneously had expected that the Court would exclude the tapes referred to above. They further testified that they were totally surprised when the Court excluded only the Halloran tapes and admitted those incriminating Martorano. When the Government rested, having succeeded in getting those Martorano tapes admitted,[2] counsel testified that the only viable way for them to meet the impact of the tapes was to have Martorano take the stand and try and explain them away. In so deciding, they had in mind that Martorano is the picture of a sophisticated businessman. He is good-looking, articulate, well-educated and highly intelligent, according to Oteri's testimony. He is also well-dressed, well-groomed and gives every appearance of being an urbane, successful businessman. Consequently, I do not think any experienced criminal lawyer would have advised or pursued a different approach, and, accordingly, I rule that in no way did prejudice occur to Martorano because he testified at trial.

With reference to the failure of Halloran to take the stand, Oteri testified, and I find, that at no time was there ever a plan to put Halloran on the witness stand. Although Martorano claims that he had been expressly told by counsel that if he took the witness stand Halloran would also do so, I disbelieve that testimony. Oteri and Wein-

berg each testified, and I find their testimony credible, that no such agreement was ever made. The attorneys testified that they thought about Halloran's possible testimony as a remote alternative.

Moreover, I find that had Halloran taken the stand, his testimony would not have aided Martorano. Both Oteri and Weinberg testified that Halloran was an extremely poor risk as a defense witness because of his hair-trigger temper, his inarticulateness and his lengthy criminal record (which was not before the jury through earlier testimony, in contrast to Martorano's situation). Weinberg testified that the considerations that negated putting Halloran on the witness stand were the following:

1. "his prior criminal record, which had not been testified to by Pallotta, and, inclusive of that, would be a federal bank robbery conviction, which I was not anxious for the jury to hear.

2. Second of all is my subjective opinion as to how Halloran communicated and what his credibility would be to the jury . . .

3. Further was the weakness of the case against Halloran, as compared to the strength of the case against Martorano—the difference being the admission of tape recordings against Jimmy and the exclusion of tape recordings against Brian.

4. Fourthly was the fact that 95% of the testimony that I would wish to elicit from Halloran to rebut the case against him had been testified to by (Martorano) . . . persuasively, in my opinion. Mr. Martorano, in my opinion, made an excellent witness."

Very importantly, it should also be noted that, as Weinberg testified, if separate attorneys had represented Martorano and Halloran, then there would have been no way that Martorano could have required Halloran to relinquish his Fifth Amend-

---

2. The Court of Appeals affirmed admission of the tapes. *See* 557 F.2d 1 (1st Cir. 1977), and 561 F.2d 406 (1st Cir. 1977).

ment right to stay off the witness stand. Therefore, Martorano could not possibly have been prejudiced by joint representation as far as Halloran's testimony is concerned, because he would not have been able to demand and obtain such testimony even had he been represented by a separate lawyer. Additionally, had Halloran testified, his testimony could not have helped Martorano in any way. In Oteri's words: "He wasn't there at the time of the loan allegedly being made and wasn't there at the time of the alleged robbery." Therefore, for the above-stated reasons, I rule that the claim that Martorano was prejudiced by Halloran's failure to testify is implausible and has been shown by the government to have no basis in fact.

Turning next to the question of the Louis ("Bugsy") Pallotta testimony, Martorano claims that he was prejudiced by Louis not taking the stand because his testimony could have contradicted the testimony of Louis' brother Peter. The record, however, is clear that both Oteri and Weinberg in an objective evaluation of the possible impact of Louis Pallotta's testimony felt that he would be a liability to both Martorano and Halloran and could be of no assistance whatsoever to either of them. Both lawyers knew that Louis Pallotta had given a prior statement to the Federal Bureau of Investigation which flatly contradicted any exculpatory testimony he might have given as a defense witness. Although Martorano contends that he was never advised of Louis Pallotta's prior statement to the F.B.I., Weinberg testified, and I find, that Martorano was told about it well in advance of trial. Bugsy Pallotta's prior statement made no mention of Halloran. Consequently, Halloran did not run the risk of embarrassment from any prior inconsistencies regarding him which Martorano would have run had his attorney called Bugsy, *i. e.,* it made more sense from Martorano's point of view to keep Bugsy off the stand than it did from Halloran's.

Both Oteri and Weinberg testified that a further problem with putting Louis Pallotta on the witness stand was his 100% Armed Services disability for a nervous disorder and his lengthy psychiatric history, including diagnosis as a paranoid schizophrenic. Both lawyers also knew that the prosecution had copies of all of Louis Pallotta's pertinent psychiatric records. Much more importantly, both Oteri and Weinberg also knew that Attorney Boudreau, the government prosecutor, intended to vigorously cross-examine Bugsy as to his psychiatric history, were Bugsy to take the stand, and both Oteri and Weinberg anticipated that line of cross-examination would severely damage, if not totally destroy, Bugsy's value as a defense witness.

Oteri also testified that a law associate of his conducted extensive testing in their law offices of Bugsy Pallotta as a potential witness prior to the trial, and this testing by means of a "dry run" in which the law associate sharply questioned Bugsy as if he were on the witness stand corroborated Oteri's apprehensions as to the negative impact on Martorano's defense Bugsy Pallotta's testimony would have had. In fact, Oteri stated that he thought Pallotta would make a "horrible witness." Accordingly, in light of Louis' prior inconsistent statement to the FBI, his psychiatric history, and the negative assessment by Oteri and Weinberg as to his value as a witness, I rule that there is no reason in the world to speculate that separate counsel would have analyzed the potential impact of Louis Pallotta's testimony any differently than did Oteri and Weinberg.

My conclusion that Martorano was in no way prejudiced by joint representation is buttressed by the facts that Martorano participated actively in his own defense throughout preparation for trial and that Halloran, who was then incarcerated, did not participate in any manner. Weinberg testified that he and Martorano spent "hundreds of hours together" in preparation of the defense. Oteri stated that Martorano spent "a great deal of time with us. He was very helpful to us and contributed a great deal to the strategies." Martorano himself testified that he was a vocal and active participant in the preparation of his defense. It should also be noted that Oteri

and Weinberg, testifying under sequestration of witness conditions, said that if the case were to be retried with a stranger representing Halloran, neither of them would do a single thing differently from what they did during trial. Both attorneys assert that no action taken regarding trial strategy was motivated by a conflict of interest, and I believe their testimony on this point.

Furthermore, my recollection of Martorano's trial and my re-examination of the trial record convinces me that a substantial and vigorous defense of Martorano was conducted which, if believed by the jury, would have exonerated him. I can conceive of no cross-examination which might have been hindered nor any alternative theory of defense squelched because of joint representation. As the trial judge, I attest that counsel conducted Martorano's defense in an able manner indicative of their extensive experience in criminal law. The record in this case does not indicate any divergence between the interests of Martorano and Halloran.

It must be kept in mind that after the prosecution rested at trial, the evidence before the jury strongly tended to incriminate Martorano on all counts of the indictment, while there was evidence against Halloran on only two counts. Under such circumstances, separate counsel would have been ill-advised to utilize any different trial strategy. As Judge Mansfield pointed out in an analogous situation in *United States v. Wisniewski,* 478 F.2d 274 (2d Cir. 1973), "[w]hen a trial culminates in a verdict of guilty the temptation is great for a defendant, armed with hindsight, to claim that his lawyer's strategy . . . was motivated by a conflict of interest." *Id.* at 284.

There is simply no evidence before me from which to conclude that the decision to put Martorano on the witness stand and the decision to keep Halloran off, or the decision not to call Louis Pallotta as a witness for the defense, resulted from a conflict of interest between Martorano and Halloran. The record contains nothing from which it can be inferred that prejudice existed from joint representation. Therefore, I am satisfied that the Government has carried its burden of disproving prejudice from joint representation. As the Court of Appeals recognized in *United States v. Foster, supra* at 4, "[t]he possibility here that another approach might have been used, with better results for the defendant, exists in every case and is very far indeed from making out a deprivation of constitutional right." Accordingly, the motion for a new trial is denied.

■ Two issues remain. First, the petitioner claims that the Government suppressed an exculpatory tape recording of a December 2, 1974, conversation involving Peter Pallotta, the chief prosecution witness.[3] This Court allowed petitioner's motion for production of that tape recording at the hearing on the motion for new trial. On the basis of my careful scrutiny of that three-minute tape, I find that it is patently and totally inaudible. Therefore, I rule that it could not be exculpatory or relevant to Martorano's claims. I also find on the basis of the testimony of audio-systems expert F.B.I. Agent Stewart that because the interference on the tape is in the audio frequency range, it cannot be filtered out effectively without filtering out the human voices which also are in the audio frequency range.

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. In this case, although the prosecution mistakenly thought the disputed tape had been destroyed because of its inaudibility, I rule there was no violation of the so-called *Brady* rule, *supra,* because the tape is in no way material to Martorano's guilt or punishment. Three F.B.I. agents testified at the

---

**3.** No claim is made that the conversation involved petitioner as a participant.

evidentiary hearing with reference to the tape recording. They stated that the recording was made when Peter Pallotta entered Chandler's restaurant while under F.B.I. surveillance and while equipped with a Kell body transmitter. Agent John Morris, the case agent, testified that Pallotta was sent in to leave $400 of government funds as a payment of "juice," *i. e.,* usurious interest, to "take the heat off Pallotta." Morris testified, and I believe, that Pallotta was not sent in to obtain evidence of any kind from anyone. In fact, Morris had called Chandler's to make sure that Martorano was not there before sending Pallotta in . Morris further testified, and I believe, that he would not have sent Pallotta into the restaurant had Martorano been present. The only purpose of the Kell transmitter on Pallotta was Pallotta's safety so that if it became necessary he could have called for help to the two F.B.I. agents, Connelly and Morris, who were sitting in an unmarked car some sixty yards from Chandler's tuned in on their car radio to the frequency of Pallotta's Kell. In light of those facts and in view of the total inaudibility of the tape, petitioner's due process rights were not violated by its nonproduction prior to or at the trial.

Lastly, thirteen days after the evidentiary hearing on the motion for new trial, petitioner moved to enlarge the record through an affidavit of attorney Harvey Brower. In support of the motion, petitioner states:

1. On June 27, 1978 at the hearing on Defendant's Motion for New Trial, the affiant was engaged at trial at Essex Superior Court, and was, therefore, unavailable.

2. The affidavit is offered to impeach the testimony of witnesses Joseph S. Oteri, Esquire, and Martin G. Weinberg, Esquire, through prior inconsistent statements.

3. The admission of the affidavit is necessary and material to full presentation of all relevant evidence in support of defendant's Motion for New Trial.

The Government opposes enlargement of the record on the grounds that: (1) it is untimely in light of the fact that the statements contained in the affidavit were known or should have been known at the June 27, 1978 hearing, and (2) admission of the affidavit to impeach Oteri's and Weinberg's testimony would violate Fed.R.Evid. 613(b).

Clause b of Rule 613 provides:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

▮▮▮ This rule establishes three criteria which must be met before the statement is admissible: (1) it must be a prior inconsistent statement of a witness; (2) the witness must be afforded an opportunity to explain or deny the statement; and (3) the opposing party must be afforded an opportunity to interrogate the witness concerning the statement. *E. g., United States v. Rice,* 550 F.2d 1364, 1374 (5th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977); *United States v. Barrett,* 539 F.2d 244, 254–256 (1st Cir. 1976). Neither the second nor the third prerequisite is met here, and accordingly the affidavit is inadmissible.

In so ruling, I take note that petitioner cites no authority whatsoever in support of his irregular motion. Moreover, judicial economy does not permit reopening the record in a situation like this where no mention is made at the time of the hearing of the information in the affidavit or of affiant's unavailability. Furthermore, despite assertions to the contrary in Brower's affidavit, there is nothing on file to indicate petitioner ever retained the affiant as his counsel. Therefore, the motion to reopen the record is denied.

Order accordingly.