**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Raymond EAGLIN, Defendant-Appellant.**

**No. 75–2720.**

United States Court of Appeals,
Ninth Circuit.

Aug. 10, 1977.

As Amended on Denial of Rehearing and Rehearing En Banc Nov. 8, 1977.

G. Frank Noonan, Asst. U. S. Atty., Portland, Or., argued, for plaintiff-appellee.

Donald J. Stang, San Francisco, Cal., argued, for defendant-appellant.

Before CHOY and KENNEDY, Circuit Judges, and WILLIAMS,* District Judge.

CHOY, Circuit Judge:

Raymond Eaglin appeals his jury conviction for conspiracy to harbor or conceal, and for willfully harboring or concealing, Carl Cletus Bowles, an escaped federal prisoner. 18 U.S.C. §§ 371 & 1072. He challenges: (1) the applicability of § 1072 to his case, arguing that Bowles did not "escape from the custody of the [United States] Attorney General or from a Federal penal or correc-

---

* The Honorable David W. Williams, United States District Judge for the Central District of California, sitting by designation.

tional institution" as required by that statute; (2) the sufficiency of the instructions and evidence concerning his knowledge that Bowles was an escapee; (3) the admission of certain evidence received under the co-conspirator exception to the hearsay rule; (4) the failure of the district court to grant a mistrial despite allegedly prejudicial publicity during the course of the trial; and (5) the effectiveness of the assistance rendered by his trial counsel. We affirm.

### Facts and Proceedings Below

On May 17, 1974, Carl Bowles, a convicted murderer serving concurrent state and federal life sentences at the Oregon State Penitentiary, failed to return from a four-hour "social" pass issued to enable him to visit his niece, Joan Coberly, at a local motel. While released on the pass, Bowles was driven by Coberly to Portland, Oregon where they stayed at the homes of friends. After a few days, Coberly and Bowles were taken by a Charles Duane Armsbury to a house in Eugene, Oregon where Armsbury said he knew some people who would help them. There, they met appellant, Raymond Eaglin. The same day, in a car loaded with camping equipment, Eaglin drove Coberly and Bowles to the Willamette National Forest.

When they arrived, Eaglin helped them unload the camping equipment and showed them an elaborate bunker which he said he had constructed. He left and returned later that day with more supplies, false identification for escapee Bowles, and a gun and ammunition. He also visited the bunker a few days later, bringing additional supplies.

On June 13, 1974, Eaglin took Coberly and Bowles to an apartment attached to the rear of the home of a Mildred Wellborn in

Eugene. The next morning, they left the apartment, and Coberly went shopping at a nearby grocery store. While purchasing some wine, Coberly displayed her California driver's license and was recognized by the sales clerk who notified the police. The police surrounded the area and arrested Coberly. After a shootout, however, Bowles escaped. In the course of his subsequent flight, Bowles kidnapped and killed an elderly couple in Idaho and was finally apprehended there on June 16, 1974.

Eaglin was arrested in Eugene on August 6, 1974. He was indicted together with five co-conspirators on December 5, 1974 for willfully harboring or concealing an escaped federal prisoner in violation of 18 U.S.C. § 1072 [1] and for conspiracy to commit the same acts, *id.* § 371. On May 14, 1975, a jury found Eaglin guilty on both counts.[2] This appeal ensued.

### I. Meaning of "Escape from the Custody of the [United States] Attorney General"

■ At the outset, Eaglin protests that, even assuming *arguendo* that he did in fact render assistance to Bowles, he was not properly subject to *federal* indictment and conviction under 18 U.S.C. § 1072 for doing so. He concedes that the Government proved at trial that Bowles had failed to return from a four-hour social pass granted by the Oregon State Penitentiary where Bowles was confined, pursuant to a contract with the Federal Government, to serve concurrent state and federal sentences. But he argues that Bowles' failure to return from the pass was not an "escape" from "custody"; that, even if it was an escape from custody, it was not from a federal institution or from the custody of the United States Attorney General; and

---

1. Section 1072 provides in full as follows:

 Whoever willfully harbors or conceals any prisoner after his escape from the custody of the Attorney General or from a Federal penal or correctional institution, shall be imprisoned not more than three years.

2. Eva Kutas was one of the co-conspirators who was tried and convicted along with Eaglin. Upon appeal to this court, her conviction was affirmed. *United States v. Kutas*, 542 F.2d 527

(9th Cir. 1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977). Sara Maltzman and Greg Lui-Kwan won judgments of acquittal at the same trial.

 Peter Paul Peek pleaded guilty. Armsbury was tried and convicted separately. His appeal is still pending. *See also United States v. Armsbury*, 408 F.Supp. 1130 (D.Or.1976) (jury selection issues).

that, even if the Oregon State Penitentiary was at one time properly designated by the Attorney General as a place of confinement for Bowles, it ceased to be so when it violated its contractual agreement with the Federal Government by issuing Bowles a social pass. We are not convinced.

First, 18 U.S.C. § 4082(d) provides that a willful failure of a prisoner to remain within the extended limits of his confinement, *or to return within the time prescribed* to an institution or facility designated by the Attorney General, shall be deemed an escape from the custody of the Attorney General punishable as provided in chapter 35 of this title.

(Emphasis added). *See United States v. Phipps*, 543 F.2d 576 (5th Cir. 1976); *United States v. Leonard*, 162 U.S.App.D.C. 212, 498 F.2d 754 (1974); *United States v. Hollen*, 393 F.2d 479 (4th Cir. 1968); *United States v. Frankenberry*, 387 F.2d 337, 338 (2d Cir. 1967); *McCullough v. United States*, 369 F.2d 548, 549–50 (8th Cir. 1966). The custody of the Attorney General continues despite the unsupervised nature of the temporary release from confinement granted under a social pass, and a prisoner who violates the terms of such a release is subject to being punished for escaping from custody. *Compare Tucker v. United States*, 251 F.2d 794, 797–99 (9th Cir. 1958); *Giles v. United States*, 157 F.2d 588, 589–90 (9th Cir. 1946), *cert. denied*, 331 U.S. 813, 67 S.Ct. 1197, 91 L.Ed. 1832 (1947); *United States v. Vaughan*, 144 U.S.App.D.C. 316, 446 F.2d 1317 (1971); *United States v. Rudinsky*, 439 F.2d 1074, 1076–77 (6th Cir. 1971); *Read v. United States*, 361 F.2d 830 (10th Cir. 1966). There is no reason to think that "escape" and "custody" would be defined differently by Congress in the context of punishing those who aid the escapee. *See United States v. Viger*, 530 F.2d 846 (9th Cir. 1976); *United States v. Hobson*, 519 F.2d 765 (9th Cir.), *cert. denied*, 423

U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975); *United States v. Howard*, 545 F.2d 1044 (6th Cir. 1976). Eaglin's first contention is thus clearly without merit.

■ Second, while the Oregon State Penitentiary is not a "Federal penal or correctional institution," it was designated by the Attorney General as the place of confinement in which Bowles was to serve his concurrent federal sentence. Section 4082(b) provides that such an institution may be "maintained by the Federal Government or otherwise," and we have repeatedly held that an escape from a state institution is an escape from the custody of the Attorney General if the prisoner has been confined there under the authority of the Attorney General. *See, e. g., Viger, supra* at 847; *Hobson, supra* at 770–71; *Tucker, supra* at 797, 799–800. *See also Howard, supra.*[3]

Finally, Eaglin argues that, since the social pass given to Bowles was not authorized under the confinement contract between the state and federal authorities, the custody of the Attorney General terminated, and Bowles either became a free man or reverted to the custody of the state alone, when he was released. This contention is patently frivolous. *See Tucker, supra* at 798–99 (allegedly unauthorized movement of prisoner to unguarded "civilian" section of hospital for treatment cannot "be tortured into a legal and/or wilful 'abandonment of custody' over him"). *Cf. McCullough, supra* at 550 (defendant's failure to return to a work release center constituted escape from the custody of the Attorney General even though the center had not formally been "designated or certified as a qualified place of confinement").

Bowles escaped from the custody of the Attorney General within the terms of 18 U.S.C. § 1072.

---

**3.** Eaglin also points to language in *Viger, supra*, which indicates that, if a prisoner who is confined pursuant to a writ of habeas corpus ad testificandum appears before the district court to testify, the custody of the Attorney General may be "superseded" by that of the court. *See*

530 F.2d at 847. Whatever the validity of that dictum, it is clearly inapposite to the instant facts. Confinement in an institution designated by the Attorney General is not superseded by release on a social pass which involves no independent superseding authority.

## II. *Eaglin's Knowledge that Bowles Was an Escapee*

In order to convict under 18 U.S.C. § 1072, the Government must prove that Eaglin "willfully" harbored or concealed an escaped federal prisoner. This element has been read to require that the defendant had knowledge that the person whom he aided was an escapee. *United States v. Deaton*, 468 F.2d 541, 543 (5th Cir. 1972), *cert. denied*, 410 U.S. 934, 93 S.Ct. 1386, 35 L.Ed.2d 597 (1973). *See United States v. Hobson*, 519 F.2d 765, 769–70 (9th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975).[4] Similarly, "when knowledge of a fact is required to convict for a substantive offense, knowledge is also required to convict for conspiracy to commit the substantive offense." *United States v. Bekowies*, 432 F.2d 8, 14 (9th Cir. 1970) (applying § 1071). *See United States v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *Ingram v. United States*, 360 U.S. 672, 677–78, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); *Jefferson v. United States*, 340 F.2d 193, 197 (9th Cir.), *cert. denied*, 381 U.S. 928, 85 S.Ct. 1567, 14 L.Ed.2d 686 (1965).

Eaglin here contends both that the jury instructions given by the trial court on the element of knowledge were so misleading as to constitute reversible error and that, in any event, the evidence offered by the Government to show his knowledge of Bowles' status was insufficient.

### A. Jury Instructions

Eaglin challenges the propriety of three instructions which, he claims, "watered down" the Government's burden of persuasion on the element of knowledge.[5] No objection, however, was raised to them at trial. *See* Fed.R.Crim.P. 30. And, when the jury instructions are viewed as a whole,

*United States v. Silla*, 555 F.2d 703, 705–06 (9th Cir. 1977); *United States v. Kaplan*, 554 F.2d 958, 968 (9th Cir. 1977); *United States v. Lemon*, 550 F.2d 467, 470 (9th Cir. 1977), we cannot say that the trial court committed "plain error," Fed.R.Crim.P. 52(b); *United States v. Esquer-Gamez*, 550 F.2d 1231, 1235 (9th Cir. 1977); *United States v. Tri-State Motor Co.*, 550 F.2d 494, 495 (9th Cir. 1977). *See United States v. Outpost Development Co.*, 552 F.2d 868, 870 (9th Cir. 1977).

The trial court instructed the jury that [n]o person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate, and deliberate avoidance of such knowledge is the equivalent of actual knowledge.

Recently, in *United States v. Jewell*, 532 F.2d 697 (9th Cir.), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976), this court sitting en banc approved the giving of such an instruction under some circumstances. We cautioned, however, that a proper "deliberate ignorance" instruction should also advise the jury

directly (1) that the required knowledge is established if the accused is aware of a high probability of the existence of the fact in question, (2) unless he actually believes it does not exist.

532 F.2d at 704 n. 21. Eaglin attacks the instruction given in his case as being so deficient in relation to the instruction recommended by us in *Jewell* as to call for reversal. We disagree.

The first requirement of our recommended instruction appears to have been approximated by the trial court's use of the words "intentionally" and "deliberate." In *Jewell*, we also quoted with approval the following passage from G. Williams, Criminal Law: The General Part § 57, at 157 (2d ed. 1961):

---

4. It was, of course, unnecessary for the Government to prove also that Eaglin knew that Bowles was an escapee from *federal* custody in order to convict under 18 U.S.C. § 1072. *Hobson, supra. See United States v. Feola*, 420 U.S. 671, 684–85, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *United States v. Lentz*, 524 F.2d 69, 71 (5th Cir. 1975).

5. *See generally United States v. Valle-Valdez*, 554 F.2d 911, 915 (9th Cir., 1977) (noting argument that instructional error may reach constitutional proportions if it lowers the Government's burden of persuasion on a given element.) *But see Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

"To the requirement of actual knowledge there is one strictly limited exception. . . . [T]he rule is that if a party has his suspicion aroused but then *deliberately omits to make further enquiries*, because he wishes to remain in ignorance, he is deemed to have knowledge."

532 F.2d at 700 (emphasis added; footnote omitted). In fact, that statement of the rule seems to offer a defendant even less protection than that afforded by the instruction which Eaglin attacks here. Moreover, as will be discussed below, there was more than sufficient evidence to establish that Eaglin was "aware of a high probability of the existence of the fact in question."

Furthermore, in regard to the first as well as the second part—requiring the absence of a subjective belief to the contrary, *see* 532 F.2d at 704 n.21—of the *Jewell* instruction, Eaglin was amply protected by another instruction given by the district court:

Actual knowledge that Carl Cletus Bowles was an escaped prisoner is an essential element of the offenses charged in each count. You may not find a defendant guilty of any charge unless you find beyond a reasonable doubt that such defendant knew that Carl Cletus Bowles was an escaped prisoner. It is not sufficient for the Government to merely show that a defendant may have suspected or thought Carl Cletus Bowles to be an escaped prisoner.

■ In any event, since no objection was made at trial to the giving of these instructions, our review is limited—as it was in *Jewell*—by the "plain error" doctrine of Fed.R.Crim.P. 52(b).[6] Therefore, we need not consider whether we would find these instructions to be reversible error under the more searching "harmless error" standard of Rule 52(a). *Compare United States v. Esquer-Gamez*, 550 F.2d 1231, 1234–36 & n.5 (9th Cir. 1977); *United States v. Valle-Valdez*, 554 F.2d 911, 914 (9th Cir. 1977). In

the instant case, we conclude that, while it did not anticipate the *Jewell* standards precisely, the trial court's giving of this "deliberate ignorance" instruction by no means rises to the level of "plain error." *See United States v. Dozier*, 522 F.2d 224, 228 (2d Cir.) (on petition for rehearing), *cert. denied*, 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394 (1975), *cited in both Jewell*, 532 F.2d at 704 n.21, *and Esquer-Gamez*, 550 F.2d at 1235–36 n.5.

■ Next, Eaglin attacks the instruction which provided that, in a conspiracy case, the "guilt of any defendant may be established without proof that he or she personally did every act constituting the offense charged." He now argues that this instruction improperly allowed the jury to "attribute" to him the knowledge of Bowles' status possibly possessed by other co-conspirators.

The challenged instruction, however, mentioned only the attribution of actions. Thus, those cases relied upon by Eaglin that disapproved instructions which permitted attribution of "knowledge," *see United States v. Bagby*, 451 F.2d 920, 928–29 (9th Cir. 1971); *Jefferson v. United States*, 340 F.2d 193, 197–98 (9th Cir.), *cert. denied*, 381 U.S. 928, 85 S.Ct. 1567, 14 L.Ed.2d 686 (1965); *United States v. Tavoularis*, 515 F.2d 1070, 1074 (2d Cir. 1975), are clearly distinguishable. Moreover, in other instructions, the trial court made it clear that a defendant could not be convicted unless it was shown beyond a reasonable doubt that "such defendant knew" that Bowles was an escaped prisoner.

■ Finally, Eaglin challenges the following "specific intent" instruction:

It is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

---

**6.** Indeed, Eaglin's claim to a rigorous review here is even weaker than was that of the defendant in *Jewell*. It is clear that, unlike *Jewell, see* 532 F.2d at 704 n.21; *id.* at 707–08 (Kennedy, J., dissenting), Eaglin made no ob-

jection which might even arguably be said to have been directed at the giving of these instructions. *See also Valle-Valdez, supra* at 326 n.4.

This instruction was criticized by us in *Cohen v. United States*, 378 F.2d 751, 755 (9th Cir.), *cert. denied*, 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967). There, we expressed concern that such an instruction might allow the jury to find specific intent without regard to the totality of the circumstances, shift the burden of proof on intent from the prosecution to the defense, or lead the jury to use a reasonable man test of knowledge or intent, rather than one which requires the jury to find that the defendant actually had the requisite state of mind.

■ In the case at bar, however, other instructions given by the district court clearly guarded against these dangers. Several times the court urged the jury to determine intent "from all the facts and circumstances surrounding the case"; it instructed that it was the "prosecution [who] must establish beyond a reasonable doubt that [a defendant] intentionally committed the acts" charged; and, finally, the court even went so far as to charge that the "Government must prove that the defendants knowingly did or caused to be done an act which the law forbids purposely intending to violate the law." Viewing these instructions as a whole, Eaglin has no cause to complain. *Cohen*, 378 F.2d at 755. *See United States v. Trexler*, 474 F.2d 369, 371 (5th Cir.), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2759, 37 L.Ed.2d 157 (1973); *United States v. Moore*, 140 U.S.App.D.C. 309, 435 F.2d 113, 115–16 & n.3 (1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1376, 28 L.Ed.2d 647 (1971).[7]

### B. Sufficiency of the Evidence

■ Ultimately, it seems that Eaglin's principal objection here is that the trial court specifically instructed the jury that "[i]ntent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind." It is clear, however, that the jury was free to infer Eaglin's knowledge concerning Bowles' status from circumstantial evidence, and a conviction based on such proof is not for that reason infirm. *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1955); *United States v. Green*, 554 F.2d 372, 375 (9th Cir. 1977); *United States v. Nelson*, 419 F.2d 1237, 1240–41 (9th Cir. 1969). *See United States v. Jewell*, 532 F.2d 697, 698–99, 701–02 n.11 (9th Cir.) (en banc), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *United States v. Kutas*, 542 F.2d 527, 528 (9th Cir. 1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977); *United States v. Giampa*, 290 F.2d 83, 84–85 (2d Cir. 1961). And,

> [i]n determining the sufficiency of circumstantial evidence, the question "is not whether the evidence excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive at its conclusion."

*United States v. Daniels*, 549 F.2d 665, 668 (9th Cir. 1977), *quoting United States v. Heck*, 499 F.2d 778, 790 (9th Cir.), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 677, 42 L.Ed.2d 680 (1974). *See, e. g., United States v. Kaplan*, 554 F.2d 958, 963 (9th Cir. 1977); *United States v. King*, 552 F.2d 833, 852 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

■ In reviewing the evidence to determine whether it was sufficient to allow a jury to convict, we must view it in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v.*

---

7. Eaglin points to yet another instruction which he claims was improper and requires reversal despite his failure to object to it below: the trial court's instruction defining "accessory after the fact." Eaglin was not charged in the indictment as an "accessory" to any crime, and he argues here that the jury may in fact have convicted him only of this lesser-included offense. While erroneous, the inclusion of this instruction does not in this case amount to plain error. *See United States v. Flanagan*, 445 F.2d 263, 265 (5th Cir. 1971), *cert. denied*, 404 U.S. 1060, 92 S.Ct. 741, 30 L.Ed.2d 748 (1972). The indictment, which was read to the jury with the instructions, did not refer in any way to the crime of being an accessory, and the judge, in carefully defining the elements of each crime charged, did not once elaborate on the accessory point in over 38 pages of instructions. It is clear from the record that Eaglin was convicted of Counts I and II and not as an accessory after the fact.

*Ramirez-Rodriquez,* 552 F.2d 883, 884 (9th Cir. 1977); *United States v. Paduano,* 549 F.2d 145, 149 (9th Cir. 1977); *United States v. Westover,* 511 F.2d 1154, 1156 (9th Cir.), *cert. denied,* 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975). A jury's finding of fact may not be set aside unless it is clearly erroneous. *United States v. Glover,* 514 F.2d 390, 391 (9th Cir.), *cert. denied,* 423 U.S. 857, 96 S.Ct. 108, 46 L.Ed.2d 83 (1975). Having reviewed the entire record, we hold that there was more than sufficient evidence from which the jury could properly conclude beyond a reasonable doubt that Eaglin knew that Bowles was an escaped prisoner. *Compare Kutas, supra; Giampa, supra.*

At trial, Eaglin did not challenge the existence of a conspiracy among Bowles, Coberly, and Armsbury. He only disputed his knowing participation in it. It is axiomatic, however, that

> [o]nce the government establishes the existence of a conspiracy through independent evidence, only slight evidence is required to connect a defendant with it. *United States v. Carpio,* 547 F.2d 490 (9th Cir. 1976); *United States v. Turner,* 528 F.2d 143, 162 (9th Cir. 1975).

*United States v. Peterson,* 549 F.2d 654, 657 (9th Cir. 1977). *See, e. g., United States v. Valdovinos,* 558 F.2d 531, 533 (9th Cir. 1977); *United States v. Kaplan,* 554 F.2d 958, 963 (9th Cir. 1977); *United States v. Perry,* 550 F.2d 524, 529 (9th Cir. 1977); *United States v. Wood,* 550 F.2d 435, 441 (9th Cir. 1977). Two of the strongest pieces of evidence tending to show that Eaglin was aware of Bowles' status were statements reported as coming from Eaglin's own mouth. At trial, Coberly testified that, during their initial drive to the forest, Eaglin reassured her and Bowles in these words: "They're not—I don't really think they are going to be looking for you because everybody is looking for 'Hearst'."

Later, Wellborn testified that, when she became suspicious that Eaglin had been using the apartment attached to her home to conceal the fugitives and angrily confronted him about the matter, he responded as follows:

> You don't know anything. . . . I told them to stay pat and if they didn't stay pat, then they are on their own. . . . You don't know anything and you keep your mouth shut.

Moreover, Coberly also recounted how Eaglin had driven her and Bowles to a secret bunker in the forest and provided Bowles with false identification, a gun, and ammunition—facts which could lead a reasonable jury to conclude that Eaglin did not think that he was acting as a mere scoutmaster. We are obviously unpersuaded by Eaglin's argument that the Government produced insufficient evidence to show his knowledge that Bowles was an escapee.

### III. *Hearsay Contentions*

■ Eaglin challenges the admission of certain statements made by Bowles and testified to at trial by an FBI agent and Coberly. He recognizes that the "declarations of one conspirator may be used against another conspirator, if the declaration was made during the course of and in furtherance of the conspiracy charged," *Anderson v. United States,* 417 U.S. 211, 218, 94 S.Ct. 2253, 2259, 41 L.Ed.2d 20 (1974), but argues that the statements at issue do not fall within this exception to the hearsay rule,[8] and that, in any event, their admission deprived him of his sixth amendment right to confront adverse witnesses. We find no reversible error.

### A. The FBI Agent's Testimony

Eaglin contends that the admission at trial, over objection, of statements made to an FBI agent by escapee Bowles *after*

---

**8.** Under the Federal Rules of Evidence, a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy is not hearsay. Fed.R.Evid. 801(d)(2)(E). *See United States v. Cruz,* 536 F.2d 1264, 1267 (9th Cir. 1976). Since the Rules did not become effective until July 1, 1975, *see United States v. Hodge and Zweig,* 548 F.2d 1347, 1352 (9th Cir. 1977), they were not applicable to Eaglin's trial which concluded on May 14, 1975.

Bowles' arrest constitutes reversible error under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The Government concedes that these statements were inadmissible in federal court for the reasons that they were made neither "during the course of" nor "in furtherance of the conspiracy charged," *see Lutwak v. United States,* 344 U.S. 604, 617–18, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *Krulewitch v. United States,* 336 U.S. 440, 442–44, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *United States v. Testa,* 548 F.2d 847, 851–52 (9th Cir. 1977), but argues that their admission was harmless error in view of all the other evidence against Eaglin.

*Bruton* held that a postal inspector's testimony relating a confession by a co-defendant of petitioner Bruton violated Bruton's sixth amendment right to confrontation when it was admitted at a joint trial and the co-defendant declarant refused to take the stand. The confession implicated Bruton, but was clearly not admissible against him because it was not made during the course or in furtherance of the conspiracy charged. The crux of the Supreme Court's decision was that the trial court's instruction to the jury to disregard the co-defendant's confession in determining Bruton's guilt did not sufficiently insulate him from the incriminating effect of the confession. *See* 391 U.S. at 126–37, 88 S.Ct. 1620.

Eaglin here argues that *Bruton* controls his case and requires reversal. He claims that the only distinguishing feature is that Bowles could have been, but was not, tried with him, a factor which he contends should not call for a different result. While we agree that a *Bruton* problem may be at issue here, we disagree with Eaglin over what the nature of the *"Bruton* problem" is and what effect it has.

The *Bruton* Court employed several express analytical steps in reaching its result: (1) The hearsay confession testimony was admissible against the confessor-defendant under the well-recognized confession exception to the hearsay rule, 391 U.S. at 128 & n.3, 88 S.Ct. 1620; (2) while admissible against the confessor, the hearsay confes-

sion was not admissible against his co-defendant, Bruton, unless it fell within some other exception to the hearsay rule, such as the co-conspirator exception, *id.;* (3) since, on the facts of *Bruton,* only the confession exception applied, the testimony was admissible, but only as against the confessor himself, not against Bruton, *id.;* (4) a limiting instruction was insufficient to prevent the jury from considering the confession against Bruton in the joint trial, *see id.* 391 U.S. at 128–35, 88 S.Ct. 1620; and (5) given the inadequacy of such an instruction, the hearsay confession, was, in effect, improperly admitted against co-defendant Bruton, *see id.* at 126, 135–37, 88 S.Ct. 1620.

■ Thus, *Bruton* identifies the inadequacy of certain limiting instructions in the joint trial context and applies that procedural rule to the substantive area of out-of-court statements which were, in the first instance, inadmissible hearsay as to the nonconfessing co-defendant, though properly admitted against the confessor-defendant himself. Since, in the instant case, Eaglin was not tried jointly with the declarant, Bowles—and therefore the testimony was not even admissible as to one of the co-defendants—we are not faced with the procedural rule of *Bruton.* Moreover, had the co-conspirator or some other exception to the hearsay rule been applicable to allow the proper admission of Bowles' statement against the nonconfessor, Eaglin, there would be no substantive *Bruton* problem as well. *See, e. g., United States v. Nunez,* 483 F.2d 453, 462 (9th Cir.), *cert. denied,* 414 U.S. 1076, 94 S.Ct. 594, 38 L.Ed.2d 483 (1973); *United States v. Adams,* 446 F.2d 681, 682–83 (9th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971); *United States v. Arceneaux,* 437 F.2d 924, 927 & n.5 (9th Cir. 1971); *United States v. Rogers,* 549 F.2d 490, 498–99 &˙n.11 (8th Cir. 1976); *United States v. Swainson,* 548 F.2d 657, 661 (6th Cir.), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *McLaughlin v. Vinzant,* 522 F.2d 448, 450 (1st Cir.), *cert. denied,* 423 U.S. 1037, 96 S.Ct. 573, 46 L.Ed.2d 412 (1975); *United States v. Isaacs,* 493 F.2d 1124, 1161

(7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). *See also Bruton,* 391 U.S. at 128 n.3, 88 S.Ct. 1620; *Dutton v. Evans,* 400 U.S. 74, 85–86, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). But, since the Government here concedes the inapplicability of the co-conspirator—or any other—exception to the hearsay rule, we *are* faced with the substantive problem which underlay the *Bruton* decision: the improper admission of hearsay against a defendant. And, as to this *Bruton* problem, Eaglin is clearly correct in his assertion that the fact that Bowles was not tried with him is totally irrelevant, for, in any event, Bowles did not testify. *Compare Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), *discussed in Bruton,* 391 U.S. at 126–27, 88 S.Ct. 1620; *Dutton, supra.*

The *Bruton* Court, however, evidently further made at least two implicit assumptions concerning hearsay that have been undercut by subsequent Supreme Court decisions which refute Eaglin's claim for reversal. The first assumption apparently operative in *Bruton* was that of per se reversibility in the face of a confrontation violation.[9] This issue was squarely addressed by the Court in *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). *See also Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). The Court granted certiorari in *Harrington* to consider whether a state court *Bruton* violation was—and hence, could be—harmless error beyond a reasonable doubt, the standard for review of constitutional error under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Finding that the inadmissible hearsay testimony at issue was merely cumulative of evidence properly admitted, and that the direct evidence of petitioner's guilt was overwhelming, the Court held that the *Bru-*

*ton* error—once again assuming it to be of constitutional proportions—was harmless beyond a reasonable doubt. The Court expressly noted that the only alternative to its resolution would be to find that all *Bruton* errors were reversible per se, and that it declined to do. *See* 395 U.S. at 254, 89 S.Ct. 1726.[10]

In accordance with the Supreme Court's second apparent assumption at the time it decided *Bruton, see* 391 U.S. at 126–28, 136 n.12, 88 S.Ct. 1620, some federal courts have assumed an identity between hearsay and confrontation violations. *See, e. g., United States v. Perez,* 493 F.2d 1339, 1342–43 & n.3 (10th Cir. 1974); *Ottomano v. United States,* 468 F.2d 269, 273 (1st Cir. 1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *United States v. Sidman,* 470 F.2d 1158, 1171 (9th Cir. 1972), *cert. denied,* 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973). *See also United States v. Everidge,* 488 F.2d 1, 2–3 (9th Cir. 1973). *But see United States v. Snow,* 521 F.2d 730, 734 & n.2 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). In *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), however, a case decided *after Bruton,* the Supreme Court cautioned that

> merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.

399 U.S. at 156, 90 S.Ct. at 1934 (footnote omitted). No cases were cited by the Court; nor was its statement limited on its face to cases in which hearsay is improperly admitted but the declarant was nevertheless available and willing, at some point, to testify.

---

**9.** Another possible reading of the disposition in *Bruton* is that the Court may have considered the error there so clearly harmful that it thought that there was no point in expressly undertaking harmlessness analysis. *See* 391 U.S. at 135–37, 88 S.Ct. 1620. But the Eighth Circuit below apparently thought otherwise. *See Evans v. United States,* 375 F.2d 355, 362–63 (8th Cir. 1967).

**10.** *Chapman* itself noted only three constitutional rights "so basic to a fair trial that their infraction can never be treated as harmless error": freedom from coerced confessions; right to counsel; and an impartial judge. 386 U.S. at 23 & n.8, 87 S.Ct. at 827–28.

The subsequent case of *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality opinion), however, helps to clarify matters. There, a cellmate of a co-conspirator testified as to a post-arraignment statement made by the co-conspirator implicating petitioner Evans. As in the instant case, petitioner Evans was tried separately from the declarant co-conspirator who did not testify at Evans' trial. The *Dutton* Court acknowledged that the cellmate's testimony, like that of the FBI agent involved here, was hearsay and could not come in under the federal co-conspirator exception, for it was made neither during nor in furtherance of the conspiracy. *See id.* at 80–81, 91 S.Ct. 210. Under a *state* co-conspirator exception, however, it was admissible. Thus, the Court was squarely faced with the question of whether testimony which would have violated the *federal* hearsay rules could nonetheless be held not to infringe the defendant's sixth amendment right to confrontation.

On the basis of a rather elaborate test, *see id.* at 88–89, 91 S.Ct. 210, the Court held that the testimony involved no constitutional violation, for the unavailability of the declarant for cross-examination did not deprive the trier of fact of a satisfactory basis for evaluating the truth of the extrajudicial declaration, *see id.* at 89, 91 S.Ct. 210, *Adams*, 446 F.2d at 683. The *Dutton* plurality enumerated several criteria which there indicated whether the requisite "satisfactory basis" for the jury's determination is present:

(1) [T]he declaration contained no [express] assertion of a past fact, and subsequently carried a warning to the jury against giving it undue weight; (2) the declarant had personal knowledge of the identity and role of participants in the crime; (3) the possibility that the declarant was relying upon faulty recollection was remote; and (4) the circumstances under which the statements were made did not provide reason to believe that the declarant had misrepresented the defendant's involvement in the crime.

*United States v. King*, 552 F.2d 833, 845 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977), *quoting Snow*, 521 F.2d at 734 (bracketed material added). *Green* and *Dutton*, both decided after *Bruton*, thus teach that whether a hearsay violation also constitutes a confrontation violation must be determined by resort to the *Dutton* analysis; confrontation violations do not inexorably follow from hearsay violations.

In summary, the Supreme Court in *Bruton* evidently assumed that it was dealing with a constitutional confrontation problem as well as a violation of the hearsay rules of evidence and that such an error demanded per se reversal. While *Harrington* later recognized that confrontation errors could be harmless under the constitutional test of *Chapman*, it still assumed an identity between hearsay and confrontation violations. It was only with *Green* and *Dutton*—both of which were decided *after Harrington*[11]

---

11. It is true, however, that, even after *Green* and *Dutton* were decided, the Supreme Court—without discussion or citation to those cases—applied the *Harrington* test to a *Bruton* error. *See Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). One possible explanation for such an approach may be that the Court considered itself to be without a test by which to determine whether the hearsay error was of constitutional dimensions, for the *Dutton* test appeared in a plurality opinion only. *See Nelson v. O'Neil*, 402 U.S. 622, 625–30, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971) (failing to cite *Dutton*). *See also Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972) (decided subsequent to *Schneble*, majority endorsing *Dutton* "indicia of reliability" test). This circuit has, of course, adopted the *Dutton*

criteria. *See, e. g., United States v. Snow*, 521 F.2d 730, 734 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976); *United States v. Baxter*, 492 F.2d 150, 177 (9th Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

Moreover, *Schneble* involved a joint trial while, like *Dutton*, the instant case does not. Nevertheless, although the *Dutton* plurality distinguished *Bruton* on this basis, *see* 400 U.S. at 87, 91 S.Ct. 210, it is difficult for us to see how the fact that the declarant was or was not tried jointly with the complaining defendant bears on the substantive hearsay problem underlying *Bruton* rather than on its procedural aspect alone. *See United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Introduction of a co-conspirator's statement

—that the Supreme Court retreated from equating hearsay violations with constitutional issues. Thus, after *Green* and *Dutton*, "constitutional" harmlessness analysis is reached only after the application of the *Dutton* standard reveals a constitutional problem in addition to the hearsay violation. In the face of a constitutional error, *Harrington* teaches that the error can be harmless beyond a reasonable doubt.[12] But, if the *Dutton* analysis reveals no error of constitutional dimensions, then the nonconstitutional harmless error test of Federal Rule of Criminal Procedure 52(a) governs review of the "simple" hearsay error.[13] *See generally United States v. Valle-Valdez*, 554 F.2d 911, 914–16 (9th Cir. 1977) (distinguishing "constitutional" and "nonconstitutional" harmless error). *But cf. Wainwright v.*

*Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (waiver).

Here, the FBI agent testified that Bowles had told him that he (Bowles) had obtained a weapon in Eugene, Oregon and that the people with whom he had associated there were friends of Armsbury. Although Bowles' statements were express assertions of past fact, the other three indicia of reliability highlighted by *Dutton*—personal knowledge of participants' identities, remote possibility of faulty recollection, and no indication that the declarant misrepresented the defendant's participation in the crime—are clearly met.[14] Thus, we conclude that "'the trier of fact [had] a satisfactory basis for evaluating the truth of the prior statement'," *Dutton*, 400 U.S. at 89, 91 S.Ct. at 220, *quoting Green*, 399 U.S. at 161, 90 S.Ct. 1930. The confrontation clause, in

may indeed result in greater prejudice when the declarant co-conspirator is also a co-defendant. And, therefore, it is understandable that the *Dutton* effort to distinguish *Bruton* came in the context of its "'crucial' or 'devastating'" discussion. *See* note 15 *infra*. But such a consideration goes only to the prejudicial impact of a given piece of hearsay testimony, not to the determination of whether the confrontation clause is also implicated—a determination which governs the harmlessness standard to be employed—because of the absence of "indicia of reliability."

12. This court has often applied the *Harrington* standard to *Bruton* error. *See, e. g., Bates v. Nelson*, 485 F.2d 90, 93–95 (9th Cir. 1973), *cert. denied sub nom. Bates v. McCarthy*, 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974); *United States v. Sidman*, 470 F.2d 1158, 1170–71 (9th Cir. 1972), *cert. denied*, 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *United States v. Steed*, 465 F.2d 1310, 1317–19 (9th Cir.), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 697, 34 L.Ed.2d 667 (1972); *Olivas v. State of Arizona ex rel. Eyman*, 447 F.2d 974, 975–76 (9th Cir. 1971).

13. Numerous cases have reviewed hearsay violations by the standard of Rule 52(a) before—and even after—the Supreme Court began to "constitutionalize" hearsay problems in *Bruton* and earlier cases such as *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), and *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). *See, e. g., United States v. Clark*, 437 F.2d 942, 945–46 (6th Cir. 1977); *United States v. Hood*, 422 F.2d 737, 740 (7th Cir.),

*cert. denied*, 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); *Rice v. United States*, 411 F.2d 485, 489 (8th Cir. 1969); *Jenkins v. United States*, 404 F.2d 873, 874 (5th Cir. 1968); *United States v. Chibbaro*, 361 F.2d 365, 379 (3rd Cir. 1966); *United States v. Press*, 336 F.2d 1003, 1013 (2d Cir. 1964), *cert. denied*, 379 U.S. 965, 185 S.Ct. 658, 13 L.Ed.2d 559 (1965). *See also Swart v. United States*, 394 F.2d 5, 6 (9th Cir. 1968) ("overwhelming" evidence of guilt). But, in doing so, these cases may have been following the lead of *Lutwak v. United States*, 344 U.S. 604, 619–20, 73 S.Ct. 481, 97 L.Ed. 593 (1953), a case which predated the Supreme Court's sixth amendment concern with hearsay problems.

14. In *United States v. Snow*, 521 F.2d 730, 735 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976), we found that there was no violation of the right to confrontation when at least the second and third of the four factors were met. Three other recent cases from this circuit, *United States v. King*, 552 F.2d 833, 845–46 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977), *United States v. Wood*, 550 F.2d 435, 442 (9th Cir. 1976), and *United States v. Cruz*, 536 F.2d 1264, 1267 (9th Cir. 1976), each reached the same result, holding that all four criteria were present. These three cases, however, each faithfully relied on the *Snow* rendition of the four *Dutton* indicia of reliability, failing to note that *Snow* did not focus on the presence or absence of an "express" assertion of past fact as the key to the first factor of the *Dutton* test, 400 U.S. at 88, 91 S.Ct. 210.

this context, requires no more.[15] There was no "constitutional" error.

Since we hold that, under *Dutton*, the improper admission of the hearsay testimony did not offend confrontation principles, we need not decide whether the more rigorous test of harmlessness beyond a reasonable doubt could be met. Since the testimony was admitted over Eaglin's timely objection, our review of the evidence's harmfulness is governed by Rule 52(a).

Eaglin argues that, since it was shown that he was a friend of Armsbury in Eugene, the jury could infer that it was he who gave the weapon to Bowles. While that may be true, the jury was also offered a more direct—and concededly unobjectionable—route to that same conclusion. Coberly testified that Bowles had obtained a gun the first day that she and Bowles were in the forest, and because she also testified that Eaglin was the main person with whom they had contact on that day, it is likely that the jury inferred from her testimony that Eaglin was the one who delivered the weapon. The FBI agent's testimony on this point was at most corroborative and cumulative.[16]

Moreover, as discussed above, the Government offered evidence in addition to that concerning the source of the weapon to prove both that Eaglin helped Bowles and that he knew him to be an escapee. Of significance here are Eaglin's own statements to Bowles and Coberly concerning the attention which would be focused on "Hearst" and those to Wellborn about the use of her apartment. We conclude that, even if the introduction of the FBI agent's testimony did violate the hearsay rule, it was harmless error under Rule 52(a).[17]

---

**15.** Language in *Snow, supra* at 735, and in cases from other circuits, see, e. g., *United States v. Rogers*, 549 F.2d 490, 500 (8th Cir. 1976); *Favre v. Henderson*, 464 F.2d 359, 364 (5th Cir.), *cert denied*, 409 U.S. 942, 93 S.Ct. 235, 34 L.Ed.2d 193 (1972), indicates that other co-equal factors—including whether the evidence was " 'crucial' or 'devastating' "—may be gleaned from the unhappily worded discussion in *Dutton*, 400 U.S. at 87–89 & n.19, 91 S.Ct. 210, and must be weighed in addition to the four criteria of reliability highlighted by us in *King, Wood, Cruz*, and *Snow*. We have questioned that interpretation of the *Dutton* test in one case, *see King, supra* at 846 n.16, and ignored it in two others, *see Wood, supra* at 442, *Cruz, supra* at 1267.

Upon reflection, we conclude that, rather than serving as an enumeration of additional criteria which must be met in every case to satisfy the confrontation clause, the troublesome language of *Dutton* may more properly be read as providing possible alternative bases for the plurality's decision to uphold Evans' conviction, or reasons to hold that a violation of the federal hearsay rules is not per se a confrontation violation and to adopt the four-factor reliability test by which to make that constitutional determination. Several factors lead us to this conclusion: The Court's emphasis (1) that the evidence there was neither "crucial" nor "devastating," (2) that there was no valid objection to the testimony of 19 of the 20 witnesses called, and (3) that an eyewitness who was examined at length also related the events, could indicate the Court's inclination to hold that admission of the challenged testimony, even if in violation of the Constitution, was harmless error beyond a reasonable doubt.

*See King, supra*, at 846 n.16. *See also Biancone v. United States*, 405 U.S. 936, 942–43 & n.5, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972) (Douglas, J., dissenting from denial of certiorari); *United States v. Adams*, 446 F.2d 681, 684 (9th Cir.), *cert. denied*, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971); note 11 *supra*. The fact that the evidence was admitted under a long-established, statutory exception to the hearsay rule may have been advanced to support the conclusion that the wisdom of both time and the Georgia legislature raised a strong presumption of constitutionality. Finally, mention of the failure of Evans' counsel to subpoena witnesses, including the declarant, who might have testified that the statements were not made may be taken as an indication that the Court at least considered the possibility that some kind of waiver may have been worked.

**16.** It had also already been established, again through Coberly's testimony, that she and Bowles were helped by people who knew Armsbury.

**17.** Eaglin also claims that the prosecutor's comment to the jury on Bowles' failure to testify aggravated the harmful effect of the FBI agent's testimony. He characterizes the prosecutor's remarks as reinforcing the inferences that Bowles spoke the truth and was implicating him, and he argues that the remarks fall within the condemnation of *United States v. Sanchez*, 532 F.2d 155, 157–58 (9th Cir. 1976). In *Sanchez*, we reversed the conviction of the appellant where the counsel of another co-defendant who was relying solely on an entrapment defense told the jury at the joint trial

## B. Coberly's Testimony

Eaglin also argues that statements by Bowles to which Coberly testified at trial concerning Bowles' acquisition of a gun, $150 in cash, and false identification were inadmissible hearsay. He maintains that any statements made by Bowles as to how he obtained these items do not fall within the co-conspirator exception to the hearsay rule because, while they were clearly made during the "course of" the conspiracy, they were not made "in furtherance" of it. No objection was made to Coberly's testimony at the time it was admitted.

 A review of the transcript reveals that Coberly's testimony concerning Bowles' acquisition of the gun did not refer to any *statements* made by Bowles, but rather to *facts* which Coberly herself observed. This is not hearsay. Coberly did testify, however, that Bowles told her that Eaglin had given him the false identification, and her testimony regarding the cash appears to imply that Bowles told her that he had obtained it from Eaglin. Nevertheless, we agree with the Government that these latter statements were made to keep Coberly abreast of the conspirators' activi-

ties, to induce Coberly's continued participation in the conspiracy, or to allay her fears and, as such, were made "in furtherance" of the conspiracy. *See Salazar v. United States,* 405 F.2d 74 (9th Cir. 1968); *United States v. Crockett,* 514 F.2d 64, 71 (5th Cir. 1975); *United States v. Knippenberg,* 502 F.2d 1056, 1061 (7th Cir. 1974). There was no hearsay, and thus no *Bruton,* error, in the admission of this testimony.

 Admissibility under the co-conspirator exception to the hearsay rule does not, however, automatically demonstrate compliance with the confrontation clause. *United States v. King,* 552 F.2d 833, 845 & n.15 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); *United States v. Wood,* 550 F.2d 435, 442 (9th Cir. 1976); *United States v. Cruz,* 536 F.2d 1264, 1267 (9th Cir. 1976); *United States v. Snow,* 521 F.2d 730, 734 & n.2 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976); *United States v. Baxter,* 492 F.2d 150, 177 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). *See California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).[18] Rather, it is

that, had his client testified, he would have admitted the allegations in the conspiracy count. We held there that the appellant had been denied his right to cross-examine the co-defendant—who refused to take the stand—concerning the admission reported by the co-defendant's counsel and that, due to the lack of a limiting instruction, *Bruton* was *a fortiori* violated.

Citation of *Sanchez* adds nothing to Eaglin's case. It does no more than offer another variant of the *Bruton* hearsay problem. In spite of what Eaglin argues here, *Sanchez* was not a "counsel comment" case. Rather, the co-defendant's counsel's remarks to the jury were simply equated with the testimony of a witness in that they too provided a way in which a co-defendant's confession could come before the jury without the co-defendant himself testifying and opening himself to cross-examination. Counsel's "testimony" was no different, as a practical matter, from that of any witness reporting a declarant defendant's out-of-court confession.

Finally, Eaglin cannot seriously contend that the prosecutor's comment about Bowles' failure to testify reflected prejudicially on *his* (Eaglin's) choice not to testify. *See Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d

106 (1965); *United States v. Helina,* 549 F.2d 713, 716–19, (9th Cir. 1977).

**18.** Other circuits also recognize that, when the hearsay is *admissible* in a joint trial against the non-confessor under the co-conspirator's exception—and, therefore, *Bruton* is not implicated—the analysis of *Dutton* still must be reached to determine whether a confrontation clause violation exists notwithstanding the absence of a hearsay problem. *See, e. g., United States v. Rogers,* 549 F.2d 490, 498–99 (8th Cir. 1976); *McLaughlin v. Vinzant,* 522 F.2d 448, 450 (1st Cir.), *cert. denied,* 423 U.S. 1037, 96 S.Ct. 573, 46 L.Ed.2d 412 (1975); *United States v. Isaacs,* 493 F.2d 1124, 1161 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Childs v. Cardwell,* 452 F.2d 541, 545–46 (6th Cir. 1971), *cert. denied,* 407 U.S. 912, 92 S.Ct. 2447, 32 L.Ed.2d 687 (1972). *See also Simpson v. Wainwright,* 439 F.2d 948, 953 (5th Cir.) (Gewin, J., concurring specially), *cert. denied,* 402 U.S. 1011, 91 S.Ct. 2199, 29 L.Ed.2d 434 (1971); *United States v. Nasser,* 476 F.2d 1111, 1125–26 (7th Cir. 1973) (Stevens, J., dissenting in part).

As discussed in Part III. A., *supra,* this reasoning applies equally where the hearsay is *in-*

the reliability test of *Dutton* by which the confrontation issue—which under *Green* apparently must be faced in every case involving hearsay evidence, whether properly admitted or not [19]—is to be decided. Applying the same *Dutton* criteria to which we resorted in our analysis of the FBI agent's testimony, we again conclude that the trier of fact could satisfactorily evaluate the truth of the hearsay statement admitted under the co-conspirator exception. Hence, there was no confrontation error, as well as no hearsay error, in the admission of Coberly's testimony.

## IV. *Allegedly Prejudicial Publicity*

During a mid-trial recess, and out of the presence of the jury, the trial court inadvertently made reference to the fact that Bowles had confessed to the kidnapping and murder of the elderly couple, the Hunters. At that point, Eaglin's counsel moved for a mistrial, stating his fear that Eaglin's trial for harboring or concealing Bowles would be prejudiced by publicity concerning Bowles' independent criminal activities while at large. The court denied the motion and instructed the jury upon its return to the courtroom to avoid any contact with the media. The Bowles confession shortly became statewide news and was reported by local newspapers in Portland, where Eaglin's trial was taking place.

The trial judge took great pains throughout the remainder of the trial to shield the jury from any publicity concerning the Bowles confession. He repeatedly warned them not to expose themselves to the media. When he suggested that the jury be sequestered over the up-coming weekend, it was Eaglin who opposed the sequestration, apparently fearing that the jurors would hold it against him. The court did, however, carefully instruct the jury about avoiding media coverage over the weekend,

counseling that they not read a newspaper and that they "pull the plug" on their radios and televisions. On the following Monday, the judge repeated his warnings, and, in his final instructions to the jury, the judge admonished them again to disregard anything they might have read or heard about the case outside the courtroom. The jury was sequestered during its deliberations.

At the outset, we note that

[t]he decision to grant a mistrial lies in the broad discretion of the trial judge, *Illinois v. Somerville,* 410 U.S. 458, 461–62, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), and the burden is on the defendant to show an abuse of that discretion, *Oelke v. United States,* 389 F.2d 668, 671 (9th Cir. 1967), *cert. denied sub nom. Graves v. United States,* 390 U.S. 1029, 88 S.Ct. 1420, 20 L.Ed.2d 286 (1968). *Corley v. Cardwell,* 544 F.2d 349, 351 (9th Cir. 1976).

*Tisnado v. United States,* 547 F.2d 452, 460–61 (9th Cir. 1976). Eaglin has not alleged even one instance in which a juror was exposed to, let alone influenced by, publicity concerning Bowles' confession. The trial judge took every precaution, short of sequestration, to insulate the jury from exposure to publicity, and that final measure was resisted by the defendant himself. What we said in *Cohen v. United States,* 297 F.2d 760, 764 (9th Cir. 1962), applies here:

There is no showing that any juror read or even saw any of the offending articles; it is merely urged that they must have seen them. To so hold, we would have to presume that the jurors disregarded repeated and emphatic instructions by the Court. The presumption is the other way. As Mr. Justice Holmes said in *Holt v. United States,* 218 U.S. 245, at p. 251, 31 S.Ct. 2, at p. 6, 54

admissible—and hence there *is Bruton* error—for, as noted in *Green,* 399 U.S. at 156, 90 S.Ct. 1930, mere admission in violation of a hearsay rule does not automatically violate sixth amendment confrontation rights. Whether there is a constitutional error is resolved by the *Dutton* analysis which, in turn, dictates the

harmlessness standard by which the *Bruton* error is to be judged. *See Nasser, supra* at 1125–26, 91 S.Ct. 2199 (Stevens, J., dissenting in part).

19. *But see* note 8 *supra, discussing* Fed.R.Evid. 801(d)(2)(E).

L.Ed. 1021: "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."

The matter was within the sound discretion of the trial judge; we cannot say that his judgment about it was wrong.

 Moreover, even if we do assume *arguendo* that a juror did become aware of Bowles' confession, it is not clear to us that that information, concerning a separate crime with which Eaglin was neither charged nor connected at trial,[20] would have unduly prejudiced Eaglin's defense. Eaglin has not met his burden of showing an abuse of the trial court's discretion in refusing to grant a mistrial.[21]

## V. Effective Assistance of Counsel

Eaglin apparently makes two contentions here with regard to the effectiveness of the assistance rendered him by his court-appointed trial counsel.[22] We reject both contentions.

### A. Alleged Conflict of Interest

 Eaglin's counsel was appointed to represent him and was subsequently retained by two of Eaglin's co-defendants, Eva Agnes Kutas and Sara Maltzman, as well. An affidavit was executed by Eaglin explicitly consenting to the joint representation. That affidavit was reaffirmed by him in open court. He now alleges that his attorney slighted his defense[23] throughout

---

**20.** It is true, as Eaglin here argues, that fingerprint evidence showing Bowles' presence at the Hunters' home and evidence establishing that a telephone call was made from there to co-conspirator Armsbury—who, it was shown, was not known by the Hunters—were introduced at Eaglin's trial to connect Bowles with Armsbury and to prove certain overt acts for the conspiracy count. Eaglin fails, however, to indicate how this evidence relates to his case or to the objection he made concerning the publicity about Bowles' confession.

As we have said, no showing has been made that the jurors were in fact exposed to publicity concerning Bowles' confession. Likewise, we will not assume that the jurors had acquired, prior to trial, extensive knowledge concerning the kidnapping and murder of the Hunters, that they retained that information during trial, and that they then connected the incident to Bowles and, through him, to Eaglin, rather than to Armsbury, when the evidence was introduced. Moreover, even if such an improbable sequence were shown to have in fact unfolded, we would not be moved to hold that it unduly prejudiced Eaglin's case. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *United States v. Abascal*, 564 F.2d 821, 825 (9th Cir. 1977); *de Kaplany v. Enomoto*, 540 F.2d 975, 987 (9th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977).

**21.** Eaglin also contends, however, that the trial judge's exercise of discretion is suspect in the instant case because he failed to conduct an individual *voir dire* of the jurors on his own motion during the remainder of the trial before declining to declare a mistrial. We have repeatedly ruled that, when a juror's impartiality is put in issue, the need to inquire of that juror as to any possible bias depends on the circumstances of each case and is a matter governed by the sound discretion of the trial court. *See, e. g., United States v. Silla*, 555 F.2d 703, 707, (9th Cir. 1977); *United States v. Perry*, 550 F.2d 524, 528 (9th Cir. 1977); *United States v. Polizzi*, 500 F.2d 856, 878–89 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *Hillard v. Arizona*, 362 F.2d 908, 910–11 (9th Cir. 1966). *See also Gordon v. United States*, 438 F.2d 858, 872–73 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971); *Mares v. United States*, 383 F.2d 805, 807–09 (10th Cir. 1967). We see no reason to believe that the trial court's decisions not to grant a mistrial or conduct a *voir dire* were based on anything other than a "scrupulous exercise of judicial discretion," *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (plurality opinion). *Compare Tisnado v. United States*, 547 F.2d 452, 460–61 & n.9 (9th Cir. 1976).

**22.** We are being asked here to review the sufficiency of the assistance rendered by Robert Ackerman, Eaglin's trial counsel below. It should be noted that H. Peter Young—who was disbarred from practice before this court because of derelictions in prosecuting *appeals* by Eaglin and another defendant, *see In the Matter of Young*, 537 F.2d 326 (9th Cir. 1976)—was not involved in the *trial* defense of Eaglin. Neither party at any time refers to Young.

**23.** Kutas also argued that counsel slighted *her* defense. That we rejected her contention, *see United States v. Kutas*, 542 F.2d 527, 529–30 (9th Cir. 1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977), does not, of course, foreclose Eaglin from arguing here that *his* defense was the one which was slighted.

the trial in order better to secure acquittals for the "lesser-weights," Kutas and Maltzman. *See United States v. Marshall*, 488 F.2d 1169, 1193–94 (9th Cir. 1973); *Sanchez v. Nelson*, 446 F.2d 849, 850 (9th Cir. 1971); *United States v. Mandell*, 525 F.2d 671, 677–78 (7th Cir. 1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 774, 46 L.Ed.2d 637 (1976). Eaglin contends that the existence of bias against his case is shown by such things as counsel's failure to attempt to establish for him, as counsel did for Kutas, an alibi defense.

 The question of whether or not a conflict of interest arose in the course of a joint trial has turned on the particular facts of each case. *Peek v. United States*, 321 F.2d 934, 944 (9th Cir. 1963), *cert. denied*, 376 U.S. 954, 84 S.Ct. 973, 11 L.Ed.2d 973 (1964). It is the defendant who bears the burden of demonstrating that specific prejudice has resulted to him from the alleged conflict of interest. *United States v. Kutas*, 542 F.2d 527, 529 (9th Cir. 1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977); *United States v. Nystrom*, 447 F.2d 1350, 1351 (9th Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 542, 30 L.Ed.2d 545 (1971); *Davidson v. Cupp*, 446 F.2d 642, 643 (9th Cir. 1971). *See also Carlson v. Nelson*, 443 F.2d 21, 22 (9th Cir. 1971). Moreover, where a defendant appeals his conviction on the ground that his counsel represented more than one defendant, we will, absent unusual circumstances, reject such an argument if it appears that the trial court made sufficient inquiry of the parties and counsel concerning possible conflicts of interest. *See United States v. Horne*, 423 F.2d 630, 631 (9th Cir. 1970); *Kaplan v. United States*, 375 F.2d 895, 897–98 (9th Cir. 1967); *United States v. Wisniewski*, 478 F.2d 274, 284–85 (2d Cir. 1973).

 In the instant case, both the magistrate and the trial judge meticulously in-

quired of the defendants and their counsel as to whether any conflict of interest had arisen, or might arise, from the joint representation. Given this inquiry and Eaglin's affidavit and subsequent statement in open court reaffirming the absence of conflict, we conclude that he knowingly and intelligently waived his right to separate representation. *Kutas, supra* at 530; *United States v. Frame*, 454 F.2d 1136, 1138 (9th Cir. 1972); *Kaplan, supra* at 898. *See United States v. Gaines*, 529 F.2d 1038, 1043–44 (7th Cir. 1976); *United States v. Wyman*, 510 F.2d 1020, 1025–26 (5th Cir. 1975); *United States v. Swanson*, 509 F.2d 1205, 1210 n.7 (8th Cir. 1975). And, while it is possible that unforeseeable conflicts could have arisen in the course of trial, no conflict became apparent during trial to the court, the defendants, or their counsel, and none is apparent to us now.

### B. Effective Assistance under *de Kaplany*

 Here, Eaglin maintains that, even putting to one side any prejudice which he may have suffered because of his counsel's alleged conflict of interest in representing two other co-defendants, the assistance which he did receive from counsel was deficient under the three tests identified by us in *de Kaplany v. Enomoto*, 540 F.2d 975, 987 (9th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977).[24] In support of this claim, he cites counsel's introduction into evidence of certain grand jury transcripts, counsel's alleged refusal to let him testify in his own defense, and counsel's failure to object to Wellborn's testimony that she knew he was guilty.

Even if all of these complaints were valid, we probably would not find that Eaglin's sixth amendment right to counsel was violated. Given the fact, however, that coun-

---

24. In *de Kaplany*, we identified three alternate standards by which to review the performance of counsel: (1) whether counsel's performance was "so poor and incompetent as to make the trial a farce or mockery of justice"; (2) "whether the circumstances show a denial of fundamental fairness"; and (3) whether there was a "lack of effective aid in the preparation and trial of the case—lack of counsel likely to render and rendering reasonably effective assistance." *United States v. Lemon*, 550 F.2d 467, 473 (9th Cir. 1977), *quoting de Kaplany*, 540 F.2d at 987.

sel apparently had tactical reasons for doing what he did, we need not make that more difficult determination. As we said in *Mengarelli v. United States Marshal*, 476 F.2d 617, 619 (9th Cir. 1973):

> Where counsel otherwise perform in a fully competent manner, a choice of trial tactics, even though deemed unwise in retrospect, can rarely be said to rise to the level of a deprivation of a constitutional right.

See, e. g., *United States v. Parr-Pla*, 549 F.2d 660, 664 (9th Cir. 1977); *United States v. Grummel*, 542 F.2d 789, 791 (9th Cir. 1976), *cert. denied*, 429 U.S. 1051, 97 S.Ct. 763, 50 L.Ed.2d 767 (1977); *United States v. Bradford*, 528 F.2d 899, 900 (9th Cir. 1975), *cert. denied*, 425 U.S. 914, 96 S.Ct. 1512, 47 L.Ed.2d 764 (1976); *United States v. Stern*, 519 F.2d 521, 524 (9th Cir.), *cert. denied*, 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975). Moreover, even when viewed in retrospect, counsel's tactics in the instant case do not appear to us to have been unwise.

First, counsel apparently had a sound purpose in introducing the transcript of Coberly's testimony before the grand jury: to impeach her identification of defendants, including Eaglin, by introduction of prior inconsistent statements. *See generally United States v. Morgan*, 555 F.2d 238, 241–42 (9th Cir. 1977). In addition, the Government here asserts—and Eaglin does not deny—that much of the allegedly irrelevant, inadmissible, and prejudicial testimony which appeared in the transcript, and of which Eaglin complains here, was in fact excised by defense counsel before he introduced the transcript into evidence.

Second, we agree with the Second Circuit that, "[i]n the absence of objective evidence of corroboratory circumstances, such posttrial claims [of counsel's refusal to allow a defendant to testify] must be viewed with some suspicion." *United States v. Wisniewski*, 478 F.2d 274, 284 (2d Cir. 1973). *See United States v. Kutas*, 542 F.2d 527, 529–30 (9th Cir. 1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977). Here, it appears that Eaglin was as much responsible for the decision not to testify as was his counsel. Nor does Eaglin even aver before us what he would have testified to that would have strengthened his case had he been "allowed" to testify. If defense counsel did advise against his testifying, it was probably because counsel rightly thought that, "although [defendant] might have taken the stand and denied guilty knowledge, he might also have faced a blistering cross-examination." *Wieniewski, supra.*

Lastly, while counsel did not object to Wellborn's in-court testimony to the effect that she thought that Eaglin was guilty, it is unclear to us what practical purpose such an objection would have served. The inadmissible answer came in response to a seemingly proper question by the prosecution and was, thus, not foreseeable by Eaglin's counsel. After it came in, counsel could have legitimately thought that an objection would have served only to draw further attention to the damaging statement while clearly not erasing its effect from the jurors' minds. *Cf. Bruton v. United States*, 391 U.S. 123, 128–31, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Jackson v. Denno*, 378 U.S. 368, 379–80, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

We conclude that none of the standards identified by us in *de Kaplany* was violated here. *See Greenfield v. Gunn*, 556 F.2d 935, 938 (9th Cir. 1977); *United States v. Lemon*, 550 F.2d 467, 473 (9th Cir. 1977).

We have considered appellant's remaining contentions and find them without merit.

AFFIRMED.